88 F.3d 129
 NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
New Hampshire Insurance Company and American Home
Assurance Company, Petitioners-Appellees,
v.
BELCO PETROLEUM CORPORATION, a wholly-owned subsidiary of
Enron Corporation, Enron Corporation (formerly
known as InterNorth, Inc.) and IN
Holdings, Inc., Respondents-Appellants.
 No. 1481, Docket 95-9096.
 United States Court of Appeals,
Second Circuit.
 Argued May 3, 1996.
Decided July 3, 1996.
 
 Gregory A. Markel, New York City (Orrick, Herrington & Sutcliffe, Nancy I. Ruskin, of Counsel), for Respondents-Appellants.
 George Wailand, New York City (Cahill Gordon & Reindel, of Counsel), for Petitioners-Appellees.
 Before: FEINBERG and WINTER, Circuit Judges.*
 FEINBERG, Circuit Judge:
 
 
 1
 Respondents Belco Petroleum Corporation, Enron Corporation and IN Holdings, Inc. (collectively referred to as Belco) appeal from an order entered in the United States District Court for the Southern District of New York (Griesa, Ch.J.) granting a petition to compel arbitration of a dispute between Belco and a group of its insurers. The district court held that the preclusive effect of a prior, related arbitration between the parties must be determined by the arbitrator in the current arbitration, rather than by the court. For the reasons stated below, we affirm.
 
 I. Background
 
 2
 This case stems from the settlement of insurance claims following the seizure of Belco's oil exploration and development operations in Peru in December 1985 by the Peruvian government.
 
 
 3
 Petitioners National Union Fire Insurance Company of Pittsburgh, Pa., New Hampshire Insurance Company and American Home Assurance Company (collectively referred to as National Union) were among the underwriters of a confiscation, expropriation and deprivation insurance policy (referred to by the parties as the AIG Policy) issued to Belco in 1983. The AIG Policy was one of a group of interrelated policies that together insured Belco for 90% of any covered loss up to a limit of $200 million. As a result of the seizure, Belco filed with the insurers a joint claim under the entire group of policies for the full $200 million in May 1986.
 
 
 4
 In response to the claim, all of the insurers including National Union rescinded their policies based on alleged misrepresentations made by Belco at the time the policies were issued. In August 1986, the insurers demanded arbitration of the issue of rescission, and Belco counterclaimed for the full $200 million in coverage. Beginning in October 1987, an arbitration panel of the American Arbitration Association (AAA) conducted extensive proceedings on the issue of rescission as well as on Belco's substantive counterclaim (the AIG Arbitration). In December 1988, the arbitration panel rejected the claim of rescission, found Belco's total loss to be $161 million and awarded Belco $144,900,000--90% of $161 million--plus interest. The New York State Supreme Court confirmed the arbitration award in January 1990.
 
 
 5
 In addition to the expropriation policies discussed above, Belco was insured under a maritime insurance policy with an expropriation endorsement, issued by Seahawk International Associates, Inc. (the Seahawk Policy). The Seahawk Policy covered certain vessels that were chartered by Belco and had been taken by the Peruvian government. In October 1989, Belco recovered $2,925,000 under the Seahawk Policy for the loss of those vessels. There was apparently some discussion in the AIG Arbitration of the existence of the Seahawk Policy and the possibility of Belco's recovery under it, although the parties dispute the extent and content of that discussion.
 
 
 6
 Four and one-half years later, in April 1994, National Union served Belco with a demand for arbitration under the AIG Policy seeking, in part,[1] to recoup a portion of Belco's proceeds under the Seahawk Policy on the ground that the AIG Policy provided that any recoveries for loss from sources outside the policy must be shared between Belco and the insurers.
 
 
 7
 In this second arbitration, Belco participated in preliminary proceedings before the AAA, but in June 1994 brought an action against National Union in the United States District Court for the Southern District of Texas (the Texas action). In that action, Belco sought a declaratory judgment that National Union's claim to be entitled to a share of Belco's proceeds under the Seahawk policy was barred by res judicata. After filing the Texas action, Belco filed an answer with the AAA to National Union's demand for arbitration, but declined to proceed further with the arbitration.
 
 
 8
 Four days after Belco commenced the Texas action, National Union filed a petition in New York State Supreme Court to compel arbitration. In July 1994, that action was removed by Belco to the Southern District of New York. In November 1994, on National Union's motion to dismiss or transfer the Texas action, that action was consolidated with National Union's petition to compel arbitration in the Southern District of New York.
 
 
 9
 Thereafter, in response to National Union's petition, Belco asserted that the issue of National Union's claim to a portion of Belco's proceeds from the Seahawk Policy had already been decided in the AIG Arbitration. Belco also argued that the preclusive effect of the prior arbitration award had to be determined by the court and not by the arbitrator in the pending arbitration.
 
 
 10
 Chief Judge Griesa of the Southern District then granted National Union's petition to compel arbitration. The judge rejected the contention of both parties that New York law should apply to the question of whether the court or the arbitrator should decide the preclusive effect of the AIG Arbitration. The judge then held that under federal law the arbitrator, not the court, should decide the issue. This appeal followed.
 
 II. Discussion
 
 11
 We review de novo a district court order compelling arbitration. See Collins & Aikman Products Co. v. Building Systems, Inc., 58 F.3d 16, 19 (2d Cir.1995).[2]
 
 
 12
 A petition to compel arbitration under the AIG Policy is subject to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA or the Act), because the AIG Policy is a contract evidencing a transaction--the insurance of Belco's oil exploration and development assets in Peru--that affected international commerce. See 9 U.S.C. §§ 1 and 2; Allied-Bruce Terminix Companies, Inc. v. Dobson, --- U.S. ----, ---- - ----, 115 S.Ct. 834, 839-43, 130 L.Ed.2d 753 (1995).
 
 
 13
 Belco makes three primary arguments on appeal. First, the preclusive effect of the AIG Arbitration is not a dispute that falls within the scope of the arbitration clause of the AIG Policy. Second, the district court improperly applied federal rather than New York law to the question of who--the court or the arbitrator--should decide the preclusive effect of the AIG Arbitration. Third, even if federal law applies, the court must decide the preclusion issue.
 
 A. The Arbitration Clause
 
 14
 The arbitration clause of the AIG Policy provides:
 
 
 15
 All disputes which may arise under or in connection with this policy, including any determination of the amount of the Loss, shall be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitration will be held in New York, New York, U.S.A. The award rendered by the arbitrator(s) shall be final and binding upon the parties, subject to the Limit of Liability, and judgment thereon may be entered in any court having jurisdiction thereof.
 
 
 16
 The AIG Policy also contains the following choice-of-law provision: "The construction, validity and performance of this policy shall be governed by the law of the State of New York, U.S.A."There are two components of the underlying dispute between the parties here--National Union's right to recovery from Belco and Belco's argument that National Union is precluded from doing so. By granting National Union's petition to compel arbitration, the district court determined that the arbitration provision covered both. Certainly, the language of the arbitration clause, covering "[a]ll disputes which may arise under or in connection with" the AIG Policy, is broad enough to cover both.
 
 
 17
 There is no doubt that the arbitration clause covers the first component of the underlying dispute. With regard to the second, our decision in Transit Mix Concrete Corp. v. Local Union No. 282, 809 F.2d 963 (2d Cir.1987) is directly on point. That case involved interpretation of a broad arbitration clause in a collective bargaining agreement. The appellant there sought to stay arbitration proceedings on the ground that an earlier arbitration award had resolved the issues raised in the dispute the appellee sought to arbitrate. Id. at 964. In light of the federal policy in favor of "the arbitrability of labor disputes," we held that the preclusive effect of the prior arbitration award had to be decided in the later arbitration. Id. at 968, 970.
 
 
 18
 Belco argues that Transit Mix should not apply to a commercial dispute because that decision was based on considerations unique to the labor context. We do not agree that the broad federal presumption in favor of arbitration, which Belco concedes applies to labor cases, does not apply as well to arbitration of disputes in non-labor contexts. The FAA expresses a strong federal policy in favor of arbitration in maritime and commercial disputes, and ambiguities as to the scope of an arbitration clause must be resolved in favor of arbitration. See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983); see also David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 248-49 (2d Cir.), cert. dismissed, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991). The policy in favor of arbitration extends even to non-labor arbitrations of claims based on federal statutory rights. See, e.g., Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 226, 238, 242, 107 S.Ct. 2332, 2337, 2343, 2345, 96 L.Ed.2d 185 (1987) (arbitration of certain Securities Act and civil RICO claims); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-27, 628-29, 105 S.Ct. 3346, 3353-54, 3354-55, 87 L.Ed.2d 444 (1985) (arbitration of antitrust claims). It is not surprising that the presumption in favor of arbitration applies in the commercial context as well as in the labor field, even though somewhat different considerations may be present in the latter context. The advantages of arbitration are well-known. Arbitration " 'is usually cheaper and faster than litigation; it can have simpler procedural and evidentiary rules; it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties....' " Allied-Bruce, --- U.S. at ----, 115 S.Ct. at 843 (quoting H.R.Rep. No. 542, 97th Cong., 2d Sess., 13 (1982) U.S. Code Cong. & Admin. News 765, 777). Arbitration also helps to relieve crowded court dockets.
 
 B. Application of New York Law
 
 19
 Belco argues that the district court should have applied New York--rather than federal--law to the question of who should decide the preclusive effect of the AIG Arbitration. Whether the parties have agreed, by virtue of an arbitration agreement covered by the FAA, to submit a dispute to arbitration is governed by federal law. "The [FAA] create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Cone, 460 U.S. at 24, 103 S.Ct. at 941. See also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404-05, 87 S.Ct. 1801, 1806-07, 18 L.Ed.2d 1270 (1967).
 
 
 20
 According to Belco, the choice-of-law clause in the AIG Policy incorporates into the agreement to arbitrate New York case law regarding who decides the preclusive effect of a prior arbitration--the court or the arbitrator in the subsequent arbitration. Belco further argues that, notwithstanding an apparent split in authority in New York law on this issue, the divergent lines of authority can be reconciled. Belco suggests that the New York cases "favoring arbitration of res judicata claims" are labor disputes and that such cases are governed by the "special policy consideration" in that field. Since the appeal now before us is a commercial dispute, Belco further argues, it falls into the category of New York cases that requires the preclusive effect of the prior arbitration to be decided by the court.
 
 
 21
 In response to this argument, National Union argues that there really is no divergence of authority in New York law, and that under New York law, the preclusive effect of a prior arbitration must be decided by the arbitrator. In any event, National Union's argument continues, any requirement of New York law to the contrary would be preempted by the FAA and its policy favoring arbitration.
 
 
 22
 Belco bases its argument for the incorporation of New York law primarily on the Supreme Court decision in Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). In Volt, the Court held that nothing in the FAA and its presumption in favor of arbitration would prevent the parties from agreeing, in arbitration agreements otherwise covered by the FAA, that specific state rules of arbitration procedure will apply. 489 U.S at 479, 109 S.Ct. at 1255. These state rules would not be preempted by the FAA as long as they did not "undermine the goals and policies of the FAA," id. at 478, 109 S.Ct. at 1255, even though in some cases they would stay arbitration where the federal law would compel arbitration to go forward. Id. at 479, 109 S.Ct. at 1256.
 
 
 23
 We need not address the parties' elaborate arguments regarding New York law or the preemption by the FAA of New York case law regarding the allocation of decisions between the court and arbitrators. The Volt decision did say that the FAA would not inhibit the enforcement of an agreement to arbitrate under particular state rules of arbitration. But the Court in Volt relied on the California state court's construction of the parties' agreement to incorporate certain California rules, see id. at 474-76, 109 S.Ct. at 1253-54. Belco apparently argues that the effect of Volt is that the standard New York choice-of-law clause in the AIG Policy, on its own, is sufficient to incorporate New York decisional law on the allocation of powers between the court and the arbitrator. We do not agree.
 
 
 24
 In Antonio Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the Supreme Court squarely rejected Belco's argument here. In that case, the Court declined to read (1) a broad arbitration clause and (2) a New York choice-of-law clause as incorporating into the arbitration agreement the New York state law prohibition against an arbitrator awarding punitive damages. Id. at ---- - ----, 115 S.Ct. at 1217-18. The Court agreed that, in light of Volt, the parties could have included a prohibition against punitive damages in their agreement, id. at ---- - ----, 115 S.Ct. at 1216, and the Court searched for evidence in the agreement that the parties had done so, id. at ---- - ----, 115 S.Ct. at 1216-19. The Court rejected the proffered interpretation of the New York choice-of-law clause as incorporating "New York decisional law, including that State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law." Id. at ----, 115 S.Ct. at 1217. The Court determined that the choice-of-law clause and the broad arbitration clause together, at most, created an ambiguity that would otherwise allow, under the FAA's policy in favor of arbitration, punitive damage awards. Id. at ----, 115 S.Ct. at 1218. "We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." Id. at ----, 115 S.Ct. at 1219.
 
 
 25
 Similarly, we are not persuaded that the parties here agreed to incorporate into their agreement to arbitrate New York law on which forum decides the preclusive effect of a prior arbitration. The AIG Policy contains a broad arbitration clause and a New York choice-of-law clause, both similar to the relevant provisions construed in Mastrobuono. Nothing in the arbitration clause gives any indication that anyone other than the arbitrator should decide the preclusive effect of a prior arbitration. As in Mastrobuono, we decline to read the choice-of-law clause in the AIG Policy as referring to "New York decisional law, including that State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law." 514 U.S. at ----, 115 S.Ct. at 1217; see also PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1200 (2d Cir.1996). We find no reason not to harmonize the arbitration and choice-of-law clauses precisely as the Court did in Mastrobuono. In sum, the choice-of-law clause is not an unequivocal inclusion of a New York rule that requires the preclusive effect of a prior arbitration to be decided by the court because there is another--and we think more persuasive--way to read the clause that adheres closer to the federal policy in favor of arbitration.
 
 C. The Application of Federal Law
 
 26
 Belco argues that even if federal law applies, the Supreme Court's decision in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) requires that the preclusive effect of a prior arbitration be decided by the court. First Options held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clea[r] and unmistakeabl[e] evidence that they did so." Id. at ----, 115 S.Ct. at 1924 (quotation omitted) (alteration in original). Belco argues that because there is no clear evidence that the parties agreed to arbitrate the preclusive effect of a prior arbitration, the court must decide this "arbitrability" issue. We disagree not with Belco's analysis of First Options, but with its characterization of the preclusion issue here as a part of the "arbitrability" of the dispute.
 
 
 27
 The "arbitrability" of a dispute comprises the questions of (1) whether there exists a valid agreement to arbitrate at all under the contract in question--here the AIG Policy--and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement. Under section 4 of the FAA these are the principal questions for the court to decide on a petition to compel arbitration. See 9 U.S.C. § 4; Prima Paint, 388 U.S. at 404, 87 S.Ct. at 1806 ("[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate."); Conticommodity Services Inc. v. Philipp & Lion, 613 F.2d 1222, 1224-25 (2d Cir.1980). The arbitrability issue in First Options was whether certain individuals were bound by an arbitration agreement that they did not sign. 514 U.S. at ---- - ----, 115 S.Ct. at 1922-23. This question--is there a valid arbitration agreement between the parties at all--is, under the FAA, a question for the court to decide unless the parties have unmistakably assigned that task to the arbitrator. Id. at ----, 115 S.Ct. at 1924. But "when the parties have a contract that provides for arbitration of some issues," the question becomes "whether a particular merit-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." Id. (quotation omitted). In that context, "the law reverses the presumption" and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Id.
 
 
 28
 In this case there is no question that the AIG Policy contains a valid agreement, binding on Belco, to arbitrate "some issues." Also, as noted above, both National Union's claim and the preclusive effect of the AIG Arbitration fall within the scope of the arbitration agreement. Belco contends that consideration of the preclusion issue does not require an interpretation of the AIG Policy itself, and therefore represents a type of dispute--not related to the merits--that may not be covered by the arbitration provision. According to Belco, that provision is at least ambiguous in this respect and any such ambiguity should be settled, as a matter of contract, by the court. We disagree with Belco's characterization of both the preclusion issue and the arbitration provision.
 
 
 29
 The preclusion issue is not, in the words of First Options, a disagreement over "whether [the parties] agreed to arbitrate the merits" of their dispute. Id. at ----, 115 S.Ct. at 1923. Belco's claim of preclusion is a legal defense to National Union's claim. As such, it is itself a component of the dispute on the merits. Belco's attempt to characterize the preclusion issue as not related to the merits is unavailing. It is as much related to the merits as such affirmative defenses as a time limit in the arbitration agreement or laches, which are assigned to an arbitrator under a broad arbitration clause similar to the one in the AIG Policy. See Conticommodity, 613 F.2d at 1226 (time limitation in arbitration agreement); Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568, 571-72 (2d Cir.1968) (laches).
 
 
 30
 As discussed above, the arbitration provision in the AIG Policy is sufficiently broad to encompass disputes about what was decided in a prior arbitration. The provision covers "[a]ll disputes which may arise under or in connection with this policy" (emphasis added), and is not limited, as Belco contends, to disputes that require an interpretation of the AIG Policy. We do not believe that the arbitration provision is ambiguous, but even if it were, the FAA would require resolving any ambiguity in favor of arbitration.
 
 D. Conclusion
 
 31
 We have considered all of Belco's arguments in favor of reversal of the district court's order, and find them to be without merit. We affirm the order of the district court compelling arbitration.
 
 
 
 *
 Before the appeal was argued, Judge Oakes recused himself from this case. The remaining two members of the panel have decided it pursuant to Local Rule § 0.14(b)
 
 
 [1]
 National Union also seeks to recover a portion of the value of assets that were returned to Belco by the Peruvian government
 
 
 [2]
 We note that in 1988 Congress enacted an amendment to the Federal Arbitration Act, now codified at 9 U.S.C. § 16, limiting the appealability of orders that compel arbitration. This appeal does not fall within the limitations of that provision because it is an appeal from a "final decision" by the district court where the arbitration was the sole issue before the court. See 9 U.S.C. § 16(a)(3); Matter of Chung and President Enterprises Corp., 943 F.2d 225, 227-29 (2d Cir.1991)