[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO STAY ARBITRATION
The Hartford Steam Boiler Inspection and Insurance Company ("HSB") has filed a Second Amended Motion to Stay Arbitration dated January 6, 1997 in which it seeks to stay arbitration by the so-called Panel III arbitrators on a number of grounds. The arbitration pertains to a dispute between HSB and the defendant, Industrial Risk Insurers ("IRI"). HSB has stated that it is presently asserting the following as grounds for its Motion to Stay:
 1. The Phase III arbitration panel is improperly constituted because the IRI Claims Committee appointed representatives of two companies which were not IRI Members, St. Paul Fire Marine Insurance Company (St. Paul) and Federal Insurance Company ("Chubb").
 2. The court, and not the arbitration panel, must determine whether HSB will be permitted to present evidence in the Phase III hearing regarding the nature of the Monsanto loss;
PROCEDURAL BACKGROUND
CT Page 1418
HSB is an insurance company with its principal place of business in Hartford, Connecticut. It insures what are commonly referred to in the industry as boiler and machinery risks. IRI, formerly known as Factory Insurance Association, is an unincorporated association of insurance companies which acts as a direct writer of insurance for large commercial risks on behalf of its member companies and as a cedent of boiler and machinery reinsurance to member companies. On April 8, 1975, IRI, then known as Factory Insurance Association, entered into a Reinsurance Treaty with HSB under the terms of which HSB agreed that it would accept coverage classified as boiler and machinery coverage ceded to it by IRI.
On January 13, 1992 Monsanto Corporation, an insured of IRI, sustained a loss in excess of $150 million at its Chocolate Bayou plant in Alvin, Texas. A dispute arose between IRI and HSB regarding whether the reinsurance contract between them covered the Monsanto loss. As a result of the dispute HSB commenced two civil actions against IRI in the Hartford Superior Court in November, 1992, docket nos., 703764 and 703765 (the Phase I lawsuits). In those actions HSB sought to enjoin an arbitration between IRI and Monsanto's All Risk property insurers. The purpose of that arbitration was to determine whether the boiler and machinery insurer (IRI, reinsured by HSB) or the All Risk insurers should cover the Monsanto Chocolate Bayou factory loss.
After the Phase I lawsuits were filed, IRI and HSB entered into a Settlement Agreement dated February 22, 1993. That Settlement Agreement provided for a three-phased arbitration process. The Phase I arbitration was to determine whether the loss was a boiler and machinery loss or an All Risk loss. The Phase II arbitration was to determine the terms and conditions of HSB's reinsurance contract with IRI, and the Phase III arbitration was to determine whether the loss which IRI is required to pay as a result of the Phase I arbitration is reinsured under the contract of reinsurance as identified in the Phase II arbitration award. The Settlement Agreement provided, in pertinent part:
 c. The term "Phase III Arbitration" shall mean a separate arbitration between HSB and IRI pursuant to ARTICLE 9 of the reinsurance agreement between Factory Insurance Association, IRI's predecessor in interest, and HSB, executed by Factory Insurance Association on March 25, 1975, and by HSB on April 8, 1975. The sole purpose of this arbitration will be to CT Page 1419 determine whether any loss which IRI is required to pay as a result of the decision in the Phase I Arbitration is reinsured under the contract of reinsurance as identified by the Phase II Arbitration.
As a result of the aforementioned Settlement Agreement, the Phase I lawsuits were dismissed with prejudice by Judge Wagner. Under the Settlement Agreement HSB agreed that the Phase II arbitration panel would be appointed and have its initial meeting within 45 days after a final decision in the Phase I arbitration and that the Phase III arbitration panel would be appointed and have its initial meeting within 45 days after a final decision in the Phase II arbitration.
On December 27, 1993 the Phase I panel determined that the Monsanto loss was within the terms of IRI's boiler and machinery coverage. On May 5, 1994 HSB filed another lawsuit in this court in which it claimed that the process by which the Phase II arbitration panel was selected violated the Settlement Agreement and that some of the panel members were not qualified. In that lawsuit HSB sought to enjoin the Phase II arbitration.
After a lengthy hearing, on October 26, 1995, Judge Corradino issued a fifty eight page memorandum of decision in which he held that the Phase II arbitrators had not been improperly chosen, or, in other words, that the selection process was proper and consistent with the agreement to arbitrate.
On December 28, 1995 Judge Corradino issued an order staying all remaining issues in the Phase II lawsuit and directing the parties to proceed with arbitration. HSB appealed the court's decision, but the Appellate Court granted IRI's motion to dismiss the appeal on the grounds that the order staying the lawsuit was interlocutory.
On May 17, 1996 the Phase II panel rendered a Final Decision identifying the terms and conditions of the reinsurance agreement between HSB and IRI. On that same day HSB began another proceeding in this court by filing an Application to Vacate the decision of the Phase II panel. HSB sought to introduce evidence in connection with the Application to Vacate.
By Memorandum of Decision dated November 21. 1996 the undersigned decided that HSB had no right to an evidentiary hearing on its Application to Vacate. Thereafter by Memorandum of CT Page 1420 Decision dated January 6, 1997 the undersigned denied HSB's Application to Vacate the award of the Phase II panel.
On June 19, 1996 the IRI Claims Committee appointed its Subcommittee to serve as the Phase III arbitration panel in the Monsanto reinsurance dispute. On August 2, 1996 HSB filed the complaint in this action seeking various remedies, including the stay of the Phase III arbitration. HSB subsequently filed the Second Amended Motion to Stay Arbitration dated January 6, 1997.
A hearing occurred on January 30, 1997 on the Second Amended Motion to Stay Arbitration. At that hearing HSB introduced documentary evidence in support of the first ground of its motion, that is, that the Phase III panel is improperly constituted because two of its members were representatives of "departing Member" companies who were not part of the IRI 1996 Syndicate. IRI introduced the affidavit of Stephen M. Rogers, Senior Vice President of Claims for IRI, and HSB cross-examined Mr. Rogers.
FACTUAL BACKGROUND
IRI is a voluntary, unincorporated association of insurers. IRI's constitution provides that the Members of IRI shall be insurance companies, and that the IRI Association constitutes an "agency" through which members either provide property insurance or cede or accept reinsurance of property risks. Each IRI member participates in IRI on a yearly basis by assuming a fraction of the total outstanding shares of the Association. The liability on IRI risks is allocated to each member in proportion to its share interest.
Under the IRI Constitution policies of insurance or contracts of reinsurance are structured so that each Member is respectively a direct insurer or direct reinsurer in the proportion that the Member's share holding bears to the total outstanding shares. The IRI Constitution refers to contracts of insurance as "Syndicate Policies" and states that for such policies, the liability of each Member to the "insured shall be several, each for itself, and not joint, and no Member shall be liable under any such policy, certificate or contract for the liability of any other Member thereunder." Each Syndicate Policy issued by IRI contains a "Syndicate Policy" list which shows the Members of IRI for that policy and the several liability of each such Member. Each Member has a direct insurer-insured relationship with the policyholder CT Page 1421 on every Syndicate Policy. That relationship does not cease when a Member leaves IRI in a year after the policy is issued.
The fractional participation of each Member may vary from year to year. IRI treats the group of all Members participating in each year as a separate "Syndicate". All of the accounting for premium, expenses, losses and reinsurance for each Syndicate are separately maintained by IRI. Each policy written and any resulting loss are assigned to Syndicates based on the date of loss. The Monsanto loss is assigned to the 1992 Syndicate, because the Monsanto loss occurred on January 13, 1992. IRI treats the Syndicate for any year as remaining "open" as long as there are unresolved claims or other obligations outstanding for which that Syndicate is responsible. The 1992 Syndicate remains open, and the 1992 Syndicate Members continue to receive regular reports. St. Paul and Chubb are Members of IRI for the purpose of their outstanding obligations to policyholders on unresolved claims for the 1992 Syndicate.
In 1995 Chubb and St. Paul announced that they would cease participating in IRI as of the fiscal year beginning December 1, 1995. Member companies which cease participating in ongoing underwriting activities are referred to within IRI as "departing Members" or "withdrawing Members." Departing Member Companies continue to receive regular financial reports for the years their Syndicates remain open and may continue to participate in some official membership functions. Chubb, St. Paul and other departing Members continue as Members of IRI for claims purposes until all of the losses under all of the Syndicates in which they participated have been resolved. Chubb and St. Paul are clearly Members of IRI for all purposes related to the 1992 Monsanto loss.
Article V, Section 9 of the IRI Constitution provides that: "The Executive Committee shall have and may exercise all authority and power of the Board of Directors." At its September 27, 28, 1995 meeting the Executive Committee decided that it wished to retain representation by one or more departing Member Companies on the Claims Committee, because of their ongoing interest in outstanding claims. Two representatives from the departing Member Companies, William Falsone of Chubb and Philip See of St. Paul, were on the Claims Committee. At its January, 1996 meeting the Executive Committee discussed the continued participation of Philip See on the Claims Committee. Gordon Kreh, Chief Executive Officer of HSB, was a member of the IRI Executive CT Page 1422 Committee in January, 1996, and was present at the aforementioned meeting. He raised no objection to Mr. See's continued participation on the Claims Committee, nor did he indicate that See should not participate on the ground that St. Paul was not a "Member Company." Moreover, Mr. Kreh was present at the March, 1996 meeting of the Executive Committee and again raised no objection to the St. Paul representative continuing on the Claims Committee even after the Executive Committee decided that it would not bifurcate the Claims Committee to separate current and prior year's losses.
Article 9 of the Reinsurance Agreement between IRI and HSB provides:
 A. If there is a lack of agreement with respect to the facts or the interpretation of applicable coverage, the [IRI] shall proceed to adjust the loss with the Insured. If the Reinsurer shall take exception to such loss adjustment, it shall be adjudicated by a Boiler and Machinery Sub-Committee of the [IRI] [Claims] Committee.
 B. The [IRI] Boiler and Machinery Loss Sub-Committee shall be appointed by the [IRI] [Claims] Committee and shall consist of five members, two of whom shall be representatives of [IRI] Members which do not maintain inspection service for boiler and machinery insurance; and two of whom shall be representatives of [IRI] Members which maintain inspection service for boiler and machinery insurance; the fifth member shall be a representative of the Reinsurer involved in the loss.
Both the language and the drafting history of Article 9 indicate that the parties intended that coverage disputes between IRI and its reinsurers would resolved by the disputants, i.e. by the very parties who have a financial interest in the outcome of the dispute. In 1974 HSB and other boiler and machinery Members of IRI urged IRI to change the arbitration procedures so that coverage disputes would be decided by the American Arbitration Association. However, IRI declined to do away with its existing arbitration procedures because it was felt that disputes should be "kept in the family." See Memorandum to Members Advisory Committee to the Executive Committee dated May 23, 1974. IRI also rejected a suggestion to change the arbitration provision so that one of the five panelists in the arbitration procedures would be a "disinterested person." CT Page 1423
CONSTITUTION OF PHASE III PANEL
In the recent case Foley v. Huntington Company,42 Conn. App. 712, 730, 682 A.2d 1026 (1996) the Court stated:
 "In interpreting the contract, however, not only the whole language of the instrument, but the situation of the parties and the subject-matter of their transactions as well, are to be considered. Brown v. Slater, 16 Conn. 192, 196 [1844]. `In arriving at the intent of the parties to a contract as expressed or implied in the language used by them, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence.' Shaw v. Pope, 80 Conn. 206, 209, 67 A. 495 [1907]; Sonnenberg v. Daley, 86 Conn. 1, 5, 84 A. 93
[1912]; Bryant Electric Co. v. Stein, 95 Conn. 211, 215, 111 A. 204 [1920]." Leventhal v. Stratford, supra, 121 Conn. 296.
The 1993 Settlement Agreement referred to above incorporates the arbitration provision of the 1975 Reinsurance Treaty between IRI's predecessor and HSB. That provision (Article 9) provides:
 B. The [IRI] Boiler and Machinery Loss Sub-Committee shall be appointed by the [IRI] [Claims] Committee and shall consist of five members, two of whom shall be representatives of [IRI] Members which do not maintain inspection service for boiler and machinery insurance; and two of whom shall be representatives of [IRI] Members which maintain inspection service for boiler and machinery insurance; the fifth member shall be a representative of the Reinsurer involved in the loss.
HSB argues that the word "Members" in the Article 9 means those companies who were members of IRI syndicate for the year 1996, the year in which the Phase III panel was chosen. IRI argues that "Members" includes the IRI member companies in the 1992 IRI Syndicate, the same companies who are liable for a proportionate share of the Monsanto' loss.
In this case Article 9 must be interpreted in the context of the Settlement Agreement between IRI and HSB, in which it is incorporated as well as the situation of the parties and the CT Page 1424 subject matter of their transaction. See Foley v. HuntingtonCompany, supra.
The Phase III arbitration for which HSB is seeking a stay has its existence only by virtue of the Settlement Agreement, which arose as a result of HSB's suit against the 1992 Syndicate Members. Thus, the Phase III arbitration will be between HSB on one hand and the IRI 1992 Syndicate on the other.
The intent of IRI in drafting Article 9 was to insure that coverage issues between IRI and its reinsurers be decided not by disinterested persons, as with many arbitrations, but by those who have an interest in the outcome of the arbitration by virtue of their potential liability for a portion of the arbitration award. It is clear that those companies who left the IRI syndicate after 1992, but were a part of that syndicate in 1992, such as St. Paul and Chubb, are the very companies who have the most interest in the outcome of the Panel III arbitration. They remain liable for their proportionate share of the Monsanto loss. St. Paul and Chubb have a much greater interest in the outcome of the Phase III arbitration than those companies who became IRI members after 1992 and continued to be members in the 1996 syndicate year. Yet, under HSB's interpretation of Article 9 the later companies, would be acceptable members of the Phase III Arbitration Panel, while St. Paul and Chubb would not.
The IRI Executive Committee discussed the issue of "departing Members" like Chubb and St. Paul retaining a place on the Claims Committee at their meetings of September, 1995 and January and March, 1996. It decided that Chubb and St. Paul were valid Members of IRI for the purpose of serving on the Claims Committee. HSB's chief executive officer, who was present at both of those meetings, did not object to or dissent from such decision.
Based on the foregoing the court finds that HSB's interpretation of the word "Members" in Article 9 is not correct and the Phase III arbitration panel was validly' constituted.
PHASE III PANEL'S CONSIDERATION OF EVIDENCE REGARDING NATURE OFTHE MONSANTO LOSS
Under the Settlement Agreement between IRI and HSB the Phase I panel was to determine whether the Monsanto loss was a boiler and machinery loss or an All Risk loss. The Phase I arbitration CT Page 1425 panel found that the Monsanto loss was "a loss caused by or resulting from the rupture or bursting of a pressure vessel . . ." Now, after the Phase II panel has identified the terms and conditions of the reinsurance contract between IRI and HSB, the Phase III panel is to arbitrate "whether any loss IRI is required to pay as a result of the decision in the Phase I Arbitration is reinsured under the contract of reinsurance as identified by the Phase II Arbitration."
Prior to the first organizational meeting with the parties, the Phase III panel received position papers. HSB claimed that the Phase III issue entitled it to a de novo hearing on the nature of the Monsanto loss; IRI asserted that HSB had no such entitlement as it was not provided for in the Settlement Agreement. The panel determined that it would first take evidence and hear argument on HSB's claimed right to a de novo hearing. HSB now claims that the issue is one of arbitrability, which should be decided by the court, and not the arbitration panel. IRI argues that this issue is not one of substantive arbitrability, but, rather, a procedural question as to what evidence the panel will hear to decide the issue before it.
"Arbitration is a creature of contract and its autonomy requires a minimum of judicial intrusion. Bic Pen Corporation v.Local No. 184, 183 Conn. 579, 583, 440 A.2d 774 (1981). When the parties agree to a procedure and have delineated the authority of the arbitrator, they must adhere to and be bound by those limits. Id., 584; Trumbull v. Trumbull Police Local 1745,1 Conn. App. 207, 211-12, 470 A.2d 1219 (1984). Every reasonable presumption and intendment is made in favor of sustaining the award and of the arbitrator's acts and proceedings. Bruno v. Department ofConsumer Protection, 190 Conn. 14, 19, 458 A.2d 685 (1983)." TwinTowers Assoc. v. Gilbert Switzer Assoc., 4 Conn. App. 538, 540,495 A.2d 735 (1985).
In John Wiley Sons, Inc. v. Livingston, 376 U.S. 543 (1964) the United States. Supreme Court stated:
 Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.
376 U.S. at 557. CT Page 1426
. . . . .
 In addition, the opportunities for deliberate delay and the possibility of well-intentioned but no less serious delay created by separation of the "procedural" and "substantive" elements of a dispute are clear. While the courts have the task of determining "substantive arbitrability," there will be cases in which arbitrability of the subject matter is unquestioned but a dispute arises over the procedures to be followed. In all of such cases, acceptance of Wiley's position would produce the delay attendant upon judicial proceedings preliminary to arbitration. As this case, commenced in January 1962 and not yet committed to arbitration, well illustrates, such delay may entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, to the disadvantage of the parties (who, in addition, will have to bear increased costs) and contrary to the aims of national labor policy.
 No justification for such a generally undesirable result is to be found in a presumed intention of the parties. Refusal to order arbitration of subjects which the parties have not agreed to arbitrate does not entail the fractionating of disputes about subjects which the parties do wish to have submitted.
376 U.S. at 558, 559.
An arbitration panel has the authority to resolve procedural issues related to the substantive issue before it. Marshall v.Green Giant Co., 942 F.2d 539 (8th Cir. 1991) (upholding arbitrators' decision not to hear evidence related to issues resolved in a prior arbitration); Twin Towers Assoc. v. GilbertSwitzer Assoc., 4 Conn. App. 538, 495 A.2d 735 (1985) (upholding trial court's finding that arbitrators were to determine admissibility of evidence based on parties' agreement and decisions of appellate courts); Saturn Construction Co. v. PremierRoofing, Inc., 238 Conn. 293, 297, 680 A.2d 1274 (1996).
In National Union Fire Ins. Co. of Pittsburgh, PA v. BelcoPetroleum Corp., 88 F.3d 129 (2d Cir. 1996) the Second Circuit Court of Appeals rejected an argument similar to that made by HSB here. Belco stemmed from the settlement of insurance claims following the seizure of Belco's oil exploration and development CT Page 1427 operations in Peru by the Peruvian government. The plaintiff and other insurance companies were among the underwriters of a confiscation, expropriation and deprivation insurance policy issued to Belco.
A first arbitration occurred and then plaintiff brought a second arbitration to recover some moneys paid to Belco by a separate insurance policy. Belco brought a declaratory judgment action in Texas seeking the court's declaration that the plaintiff's claim to a share in the proceeds of the second insurance policy was barred by res judicata. The plaintiff brought an action in New York to compel arbitration. Belco claimed that the preclusive effect of the prior arbitration award had to be decided by the court. The Court in Belco stated:
 The `arbitrability' of a dispute comprises the questions of (1) whether there exists a valid agreement to arbitrate at all under the contract in question — here the AIG policy — and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement. Under section 4 of the FAA [Federal Arbitration Act] these are the principal questions for the court to decide on a petition to compel arbitration. See 9 U.S.C. § 4; Prima Paint, 388 U.S. at 404, 87 S.Ct. at 1806
("[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate"); Conticommodity Services, Inc. v. Philipp Lion, 613 F.2d 1222, 1224-25 (2d Cir. 1980). The arbitrability issue in First Options [of Chicago, Inc. v. Kaplan, ___ U.S. ___, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)] was whether certain individuals were bound by an arbitration agreement that they did not sign. This question — is there a valid arbitration agreement between the parties at all — is, under the FAA, a question for the court to decide unless the parties have unmistakably assigned the task to the arbitrator. Id. at ___, 115 S.Ct. at 1924. But "when the parties have a contract that provides for arbitration of some issues," the question becomes "whether a particular merit-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." Id. In that context, "the law reverses the presumption" and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Id.
In this case there is no question that the AIG policy CT Page 1428 contains a valid agreement, binding on Belco, to arbitrate "some issues." Also, as noted above, both National Union's claim and the preclusive effect of the AIG Arbitration fall within the scope of the arbitration agreement. Belco contends that consideration of the preclusion issue does not require any interpretation of the AIG policy itself, and therefore represents a type of dispute — not related to the merits — that may not be covered by the arbitration provision. According to Belco, that provision is at least ambiguous in this respect and any such ambiguity should be settled, as a matter of contract, by the court. We disagree with Belco's characterization of both the preclusion issue and the arbitration provision.
 The preclusion issue is not, in the words of First Options, a disagreement over "whether [the parties] agreed to arbitrate the merits" of their dispute. Id at ___, 115 S.Ct. at 1923. Belco's claim of preclusion is a legal defense to National Union's claim. As such, it is itself a component of the dispute on the merits. Belco's attempt to characterize the preclusion issue as not related to the merits is unavailing.
88 F.3d at 135-136.
HSB and IRI clearly agreed to arbitrate their disputes concerning responsibility for the Monsanto loss by entering into the Settlement Agreement in 1993. The issue of whether the Phase III panel should afford HSB a de novo hearing concerning the nature of the Monsanto loss, or be bound by the decision of the Phase I panel, is a procedural one which involves what evidence the arbitrators are to consider in deciding the issue before them. Therefore, it is a question for the arbitration panel and not for the court.
For the foregoing reasons, the Second Amended Motion to Stay Arbitration is denied.
By the court,
Aurigemma, J.