**Jo Ellen PETERS, et al., Plaintiffs,**

v.

**AMAZON SERVICES LLC, Defendant.**

**Case No. C13–480–MJP.**

United States District Court,
W.D. Washington,
at Seattle.

Signed Nov. 5, 2013.

Britton D. Monts, The Monts Firm, Austin, TX, R. Martin Weber, Jr., Richard E. Norman, Crowley Norman LLP, Houston, TX, Jennifer Rust Murray, Beth E. Terrell, Terrell Marshall Daudt & Willie PLLC, Seattle, WA, for Plaintiffs.

James C. Grant, John Goldmark, Davis Wright Tremaine, Seattle, WA, for Defendant.

## ORDER COMPELLING ARBITRATION

MARSHA J. PECHMAN, Chief Judge.

This matter comes before the Court on Defendant Amazon Service LLC's motion to compel arbitration. (Dkt. No. 17.) Having reviewed the motion, Plaintiffs' response (Dkt. No. 27), Defendant's reply (Dkt. No. 32), and all related papers, and having heard oral argument on October 24, 2013, the Court GRANTS the motion, finding Plaintiffs agreed to arbitrate their dispute with Amazon. The Court therefore orders the matter to arbitration and STAYS the case.

### Background

Plaintiffs are former third-party Amazon.com sellers. (Dkt. No. 16.) They sue Amazon alleging breach of contract, breach of fiduciary duty, violations of Washington's Consumer Protection Act, and unjust enrichment. (*Id.*) The complaint is brought on behalf of a putative class of persons who "opened a seller account with Amazon and ... for whom Amazon has received Payment Transaction funds for at least one buyer on the Amazon.com website since March 15, 2009." (*Id.* at 9.) Plaintiffs also seek to represent a putative subclass of:

[A]ll persons or entities in the U.S. (1) who were provided written notice from Amazon that the account had been suspended; (2) who, at the time of such notice, had funds on account with Ama-

zon; and (3) Amazon did not transmit such funds to the seller by the shorter of (a) 90 days following the initial date the account was suspended by Amazon, or (b) the date on which the seller was provided written notification that Amazon's review was complete and the decision to close the account was final.

(*Id.* at 9.) Plaintiffs amended their complaint in April 2013. (*Id.*)

#### 1. Mr. Lane's Seller Accounts

Plaintiff Ken Lane first became an amazon.com seller in January 15, 2010. (Dkt. No. 18 at 2.) In opening his seller account, he agreed to the terms of the Participation Agreement. (Dkt. No. 18 at 4.) The Participation Agreement established eligibility for sellers, applicable policies, described Amazon's role in facilitating a marketplace, and the terms regarding transactions, seller taxes, and refunds/returns, among other subjects. (Dkt. No. 18–3). Pertinent to the instant motion, the Marketplace Participation Agreement contained a choice of law provision and forum selection clause:

The laws of the state of Washington govern this Participation Agreement and all of its terms and conditions, without giving effect to any principles of conflicts of laws or the Convention on Contracts for the International Sale of Goods. Any dispute with Amazon or its affiliates relating in any way to these terms and conditions or your use of the Services in which the aggregate total claim for relief sought on behalf of one or more parties exceeds $7,500 shall be adjudicated in any state or federal court in King County, Washington, and you consent to exclusive jurisdiction and venue in such courts.

(*Id.* at 8.)

For the next two years, Mr. Lane marketed, sold, and shipped aviation-related

equipment using amazon.com. In April 2012, Amazon notified Mr. Lane that it had received complaints from other members of the amazon.com community about emails he had sent. (Dkt. No. 19–1 at 14.) Amazon investigated and determining he was conspiring with others to price-fix. (*Id.* at 18.) It then suspended Mr. Lane's account. (*Id.* at 3.) Mr. Lane alleges when the suspension occurred, Amazon was in possession of money for pending sales. (Dkt. No. 16 at 9.) Mr. Lane appealed the suspension. (*Id.*) Shortly after, Amazon notified Mr. Lane that the suspension was permanent. (Dkt. No. 19 at 3.) Mr. Lane demanded Amazon pay him the amounts it had collected from his final sales. (Dkt. No. 16 at 9.)

Five days after Amazon closed his 2010 account, Mr. Lane opened a second one. (Dkt. No. 19 at 3–4.) To open that account, Mr. Lane was presented with the Business Solutions Agreement ("BSA"), an agreement setting the terms for the Amazon/seller relationship. (Dkt. No. 18 at 2.) The seller signup page included the following:

> Amazon Services Business Solutions Agreement: ☐ I have read and accepted the terms and conditions of the *Agreement.*

(*Id.*) The underlined word "Agreement" included a hyperlink to the BSA. Mr. Lane clicked the box indicating he had read the BSA and agreed to its terms. (*Id.*) Pertinent to the pending motion is the BSA's choice of law and forum selection provisions:

> Any dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services shall be adjudicated in the Governing Courts, … or, if Your Elected Country is the United States, we both consent that any such dispute or claim will be resolved by binding arbitration as de-

scribed in this paragraph, rather than in court, except that you may assert claims in a small claims court that is a Governing Court …

(Dkt. No. 18–1 at 5.) The BSA defined arbitration as:

> There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages) …

(*Id.*) Sellers who execute the BSA also give up the ability to pursue collective action:

> We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not on a class, consolidate or representative class action. If for any reason, a claim proceeds in court, rather than arbitration we each waive any right to a jury trial.

(*Id.* at 6.)

Because Amazon had already suspended Mr. Lane's selling privileges, it blocked the second account. (Dkt. No. 19 at 3.) Mr. Lane then opened a third account. (*Id.* at 4) Again, during the sign-up process, he was required to click on a box indicating he had read and agreed to the terms of the BSA. Amazon again blocked this account. (*Id.*) In total, after June 2012, Mr. Lane opened four new seller accounts. In each instance, he clicked a box to indicating he had read and agreed to the BSA. Mr. Lane though, never sold through any of these accounts, because Amazon blocked and terminated each one. (Dkt. No. 19 at 3–4.)

### 2. Ms. Peters' Seller Account

Ms. Peters opened an Amazon seller account in October 2012. (Dkt. 16 at 7.) In opening this account Ms. Peters agreed to the terms of the BSA by clicking a box

(identical to the one presented to Ms. Lane) indicating she assented to its terms. (Dkt. No. 18 at 2.) The BSA contained a choice of law provision identical to the one agreed to by Mr. Lane. It stipulated to arbitration of any dispute. (*Id.*)

Using amazon.com, Ms. Peters sold "hard to find DVDs." (Dkt. No. 1 at 7.) Her first sale occurred October 15, 2012. Less than a month later, Amazon informed Ms. Peters it was suspending her account. (Dkt. No. 16 at 8.) Amazon provided no reason, other than Ms. Peters' account failing the seller review process. (Dkt. No. 19–1 at 4.) Ms. Peters appealed. (*Id.*) At the time of the suspension, Plaintiffs allege Amazon was in possession of funds from Ms. Peters' sales. (Dkt. No. 16 at 8.) Amazon closed the account on November 8, 2012. (*Id.*) Ms. Peters demanded Amazon forward the money owing from her few sales. (*Id.*) She argued timely remittance was required by the Participation Agreement. (Dkt. No. 29–2 at 53.)

### 3. Procedural Posture

Plaintiffs filed this case in March 2013. (Dkt. No. 1.) They allege Amazon requires its sellers, like Mr. Lane and Ms. Peters, to use its payment transmission services for sales on amazon.com but do not timely remit money collected from their buyers. (Dkt. No. 16 at 3.) Plaintiffs allege this practice violates the Uniform Money Services Act, Washington's Consumer Protection Act, is a breach of contract, and unjustly enriches Amazon. (*Id.* at 14–26.) Plaintiffs seek a monetary award as well as a declaratory judgment. (*Id.*)

Defendant Amazon now moves to compel arbitration on the basis that Plaintiffs agreed to the BSA, which stipulates to resolving any dispute on an individual basis in binding arbitration. (Dkt. No. 17 at 1.)

### Analysis

Under the Federal Arbitration Act, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation omitted). If the answer to both questions is 'yes,' then "the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* By its own terms, the Act "leaves no place for the exercise of discretion by a district court," instead it mandates "that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)) (emphasis in original).

In the Ninth Circuit, "the most minimal indication of the parties' intent to arbitrate must be given full effect ... " *Rep. of Nicaragua v. Std. Fruit Co.*, 937 F.2d 469, 478 (9th Cir.1991) (citations omitted). It is well established "that where the contract contains an arbitration clause, there is a presumption of arbitrability," particularly where the clause is broad. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Indeed, "doubts should be resolved in favor of coverage." *Id.* (internal quotations omitted). However, "the party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party." *Gelow v. Cent. Pac. Mortg. Corp.*, 560 F.Supp.2d 972, 978 (E.D.Cal.2008). "This burden is a substantial one[.]" *Id.* at 979. "Before a party to a lawsuit can be ordered to arbitrate ..., there should be an express, unequivocal agreement to that ef-

fect ... The district court ... should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir.1991)

### 1. Is there a valid Agreement to Arbitrate?

 There is. In determining whether the parties agreed to arbitrate, Courts apply ordinary state-law contract principals. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Washington courts apply the manifest theory of contract interpretation: "[t]he role of the court is to determine the mutual intentions of the parties according to the reasonable meaning of their words and acts." *Fisher Props. Inc. v. Arden–Mayfair, Inc.*, 106 Wash.2d 826, 837, 726 P.2d 8 (1986) (*citing Dwelley v. Chesterfield*, 88 Wash.2d 331, 560 P.2d 353 (1977)).

 The intent of the parties to a contract "may be discovered not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" *Bort v. Parker*, 110 Wash.App. 561, 573, 42 P.3d 980 (2002) (citations omitted). In interpreting an arbitration clause, the intentions of the parties as expressed in the agreement controls, but "those intentions are generously construed as to issues of arbitrability." *W.A. Botting Plumbing and Heating Co. v. Constructors–Pamco*, 47 Wash.App. 681, 684, 736 P.2d 1100 (1987) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,*

*Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

The BSA contains a broad forum selection clause mandating arbitration:

Any dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services shall be adjudicated in the Governing Courts, ... or, if Your Elected Country is the United States, we both consent that any such dispute or claim will be resolved by binding arbitration as described in this paragraph, rather than in court, except that you may assert claims in a small claims court that is a Governing Court ...

(Dkt. No. 18–1 at 5.)

There is no dispute that Plaintiffs agreed to the BSA, including its forum selection clause. Ms. Peters agreed to the BSA when she opened her seller account in October 2012. Mr. Lane did so four times from June 2012 to January 2013. (Dkt. No. 19 at 4.) Indeed, neither could have opened their accounts without agreeing to the BSA in its entity. (*Id.*; Dkt. No. 18.)

Notwithstanding their clear agreement to the arbitration provision, Plaintiffs argue the Participation Agreement's jurisdictional mandate controls over the BSA. Plaintiffs point to a provision in the BSA stating that if there is a conflict "between the Program Policies and this Agreement, the Program Policies will prevail." (Dkt. No. 27 at 17.) The starting point for Plaintiffs theory is the BSA, which defines a Program Policy as:

all terms, conditions, policies, guidelines, rules and other information on the Amazon Site or on Seller Central, including those shown on the "Policies and Agreements" section of Seller Central or elsewhere in the "Help" section of Seller Central (and, for purposes of the Fulfillment by Amazon Service, specifically in-

cluding the FBA Guidelines). All Program Policies applicable to WebStore by Amazon also apply to Amazon WebStore, unless otherwise specifically stated.

(*Id.* at 8). Plaintiffs also turn to a second definition in the BSA, which defines the Amazon site as "that website, the primary home page of which is identified by the applicable one of the following (and any successor or replacement of such websites): ... the URL www.amazon.com ..." (Dkt. No. 27 at 15, quoting Dkt. No. 18–1 at 7.) Plaintiffs' attorneys attest to having reached the Participation Agreement by using the search engine Google and searching for the term "Amazon Seller Help." (Dkt. No. 29 at 2.) Likewise, Plaintiffs' counsel also attests to having located the Participation Agreement by accessing it through a paralegal's amazon.com seller home page. (*Id.* at 3.) By connecting six hyperlinks in the "help" and "other links" tab, counsel was able to locate the Participation Agreement. (*Id.; see also* Dkt. No. 45.) According to Plaintiffs, because the Participation Agreement is available on the Amazon website, it is a Program Policy. (Dkt. No. 27 at 11.)

This argument is flawed for at least three reasons. First, what matters for the present motion is the agreement Plaintiffs intended, as manifested by the contract language. *State Dep't of Corr. v. Fluor Daniel Inc.*, 160 Wash.2d 786, 795, 161 P.3d 372 (2007) (Court's must "carry out the intent of the parties as manifested ... by the parties' own contract language.") Here, the BSA's contract language evidences no intent for the Participation Agreement to be a "Program Policy." Instead, in referring to the Participation Agreement, the BSA uses the term "Seller Agreement." (Dkt. No. 18–1 at 22.) By clearly defining the Participation Agreement as a "Seller Agreement," and not a "Program Policy," the BSA's plain lan-

guage avoids the ambiguity Plaintiffs now attempt to raise. *Mayer v. Pierce County Medical Bureau, Inc.*, 80 Wash.App. 416, 421, 909 P.2d 1323 (1995) (A contract provision, however, is not ambiguous simply because the parties suggest opposing meanings; and "we will not read ambiguity into a contract where it can reasonably be avoided.") Nothing offered by Plaintiffs contravenes that reasonable interpretation. *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wash.App. 650, 654, 953 P.2d 812 (1998) ("If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent....").

Second, Plaintiffs' theory that any information on the amazon.com website is a "Program Policy" is out of step with basic contract interpretation principles to avoid absurd results. *Eurick v. Pemco Ins. Co.*, 108 Wash.2d 338, 341, 738 P.2d 251 (1987) (Courts must avoid a "strained or forced construction" of the agreement and avoid interpretations "leading to absurd results.") The basic premise of Plaintiffs' argument is that any information contained in the Amazon site, which addresses selling in Amazon meets the definition of a Program Policy. If this were true, a seller would not know to what he or she had agreed, short of reading every screen on the Amazon website and Seller Central (and doing so repeatedly to keep apprised of any changes). The Court finds this possibility an absurd result, and declines to adopt such an interpretation of the BSA.

Third, Amazon's reply neutralizes Plaintiffs' factual representations. Amazon offers credible evidence that only Legacy Sellers (those sellers who signed up before 11/2011 and have not agreed to the BSA, like Plaintiffs' counsel Mr. Hayes) can access the Participation Agreement from

their "Seller Central." (Dkt. No. 34.) It is simply not available in the Policies and Agreements page or Help page for those sellers who signed up under the BSA. (*Id.*) Amazon also explains that to reach the Participation Agreement (other than using the Google search engine) Plaintiffs' counsel had to exit the "Seller Central" and reach other "help" pages. (*Id.*) The Court therefore finds that while the some sellers may be able to reach the Participation Agreement through use of a search engine or as Legacy Sellers, Amazon did not hold it out as applicable to all sellers and readily available to all sellers.

■■■ Plaintiffs argue that any ambiguity in the contract should be read against Amazon. (Dkt. No. 27 at 22.) While it is a basic tenant of contract law that the ambiguities in a contract are construed against the drafter, that maxim does not apply here. Plaintiffs' misapplication of the ambiguity doctrine is demonstrated by their reliance on cases factually and legally distinguishable. In *Stephens v. TES Franchising*, 2002 WL 1608281, at *2–3 (D.Conn. July 10, 2002), in applying Connecticut law, the court found ambiguity on the face of the agreement because as "Section XX (entitled 'Arbitration') provides that all disputes (with the exception of trademark issues) must be decided by arbitration, but ¶ 22.01(a) expressly provides that the parties 'agree to submit any dispute between them to the jurisdiction and venue of a court of competent jurisdiction.'" Here, unlike *Stephens,* Plaintiffs do not present the Court with two competing provisions within the same document, which makes the agreement internally incongruous. Instead, Plaintiffs agreed to the BSA, which contains only one, unambiguous, forum selection clause; the ambiguity doctrine does not apply. *See Hanson Indus., Inc. v. County of Spokane,* 114 Wash.App. 523, 58 P.3d 910 (Div. 3 2002).

By this same reasoning, the other case discussed at length by Plaintiffs, *Christianson v. Poly–America,* 2002 WL 31421684 (D.Minn. Oct. 25, 2002), is off point.

Finally, Plaintiffs are incorrect in suggesting factual disputes preclude this Court from compelling arbitration. At oral argument Plaintiffs' counsel suggested the record here is akin to *Kwan v. Clearwire Corp.,* 2012 WL 32380 (W.D.Wash Jan. 3, 2012), and the intention of the parties is unknown. In *Kwan,* Judge Robart declined to compel arbitration and ordered an evidentiary hearing when the parties stipulated to the existence of a factual dispute regarding plaintiffs' assent to the agreement. *Kwan,* 2012 WL 32380 at *10. In contrast, no factual dispute exists here as to Plaintiffs' execution of the BSA.

In sum, the Court finds a valid agreement to arbitrate. Given that finding, the Court does not reach the merits of the parties' arguments as to the arbitration clause in the amazon.com conditions of use.

### 2. Do Plaintiffs' claims fall within the scope of the clause?

■■■ They do. "[A]n order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Comm'cns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *see Warrior & Gulf,* 363 U.S. at 584–85, 80 S.Ct. 1347 ("In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can pre-

vail...."). The party resisting arbitration bears the burden of showing that the agreement does not cover the claims at issue. *Green Tree Fin. Corp.–Ala. v. Randolph,* 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

The BSA mandates:

Any dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services ... will be resolved in binding arbitration.

(Dkt. No. 18–1 at 5.) The BSA defines "Service" to mean "Selling on Amazon.com, Amazon Webstore, Fullfillment by Amazon, and any related services we make available." (*Id.* at 8.) The BSA's arbitration clause clearly covers Plaintiffs' claims because they directly relate to their use of Amazon's services.

Plaintiffs, however, suggest Mr. Lane's dispute falls outside the scope of the arbitration provision because he executed that agreement only *after* the suspension of his first account. They argue his claims are instead governed by the Participation Agreement. At first, this argument has appeal. But, two provisions of the BSA render it meritless. First, the BSA contains an integration clause, making it the "entire agreement between the parties," and "supersedes any previous or contemporaneous oral or written agreements and understandings." (Dkt. No. 18–1 at 6.) Second, the BSA's arbitration provision is broad, applying to *any* dispute between the parties. It is plainly not limited to prospective disputes. *See, e.g., Green v. W.R.M. & Assocs., Ltd.,* 174 F.Supp.2d 459, 463 (N.D.Miss.2001) (where plaintiff was "clearly aware of [the defendant's] past wrongdoing ... at the time of signing the Arbitration Agreement" concerning "[a]ny dispute," "[t]his is consistent with the parties' intentions to give up their rights to sue in court for all of their poten-

tial claims, whether they occurred before or after signing of the agreement"); *Whisler v. H.J. Meyers & Co., Inc.,* 948 F.Supp. 798, 801–02 (N.D.Ill.1996) (rejecting plaintiffs' argument that arbitration agreement could not be applied to transactions that occurred prior to their signing of the account agreement, where agreement related to "any controversy arising out of or relating to any of my accounts," a statement that "speaks in terms of relationships and not timing") (internal quotation omitted). Here, when Mr. Lane executed the BSA and agreed to arbitrate any dispute, he was already aware of the facts underlying this case including Amazon's alleged failure to timely remit buyer funds. (See e.g. Dkt. No. 19–1 at 18, 22–23.) Consequently, his claims fall with the scope of the arbitration provision.

### Conclusion

Because the parties agreed to arbitration and Plaintiffs' claims clearly fall within the scope of that arbitration provision, the Court GRANTS the motion to compel arbitration (Dkt. No. 17). The Court also STAYS the matter for a period of 6 months or until arbitration is complete, whichever comes first, so that Plaintiffs can pursue their claims in arbitration. The parties are ORDERED to provide a status report to the Court regarding arbitration by May 2, 2014.

The clerk is ordered to provide copies of this order to all counsel.