**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONOVAN LEE, individually and on behalf of all others similarly situated; BRUCE KEITHLY, individually and on behalf of all others similarly situated,<br>*Plaintiffs-Appellees*,<br><br>v.<br><br>INTELIUS INC., a Delaware corporation; INTELIUS SALES LLC,<br>*Defendants-Third-Party-Plaintiffs–Appellees*,<br><br>v.<br><br>ADAPTIVE MARKETING LLC, a Delaware Limited Liability Company,<br>*Third-Party-Defendant–Appellant*. | No. 11-35810<br><br>D.C. No.<br>2:09-cv-01485-RSL<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington,
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
March 7, 2013—Seattle, Washington

Filed December 16, 2013

Before: David M. Ebel,[*] William A. Fletcher,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order denying third-party-defendant Adaptive Marketing's motion to compel arbitration in a state-law class action brought against Intelius Inc. by plaintiff alleging his credit card was improperly charged for a monthly "Family Safety Report" after plaintiff purchased a background check on the Internet.

The panel held that plaintiff did not enter into either a contract to purchase the Family Safety Report, or a contract to arbitrate. Under Washington law, the panel held that Intelius's webpage insufficiently identified Adaptive as a contracting party to support a conclusion that plaintiff entered into a contract with Adaptive to purchase the Family Safety Report. Under the Federal Arbitration Act, the panel held that even on the assumption that the plaintiff entered into a

---

[*] The Honorable David M. Ebel, Senior Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contract to purchase the Family Safety Report, plaintiff did not enter into a contract to arbitrate.

## COUNSEL

Thomas L. Boeder and Cori Gordon Moore, Perkins Coie LLP, Seattle, Washington; Darrell J. Hieber (argued), Jennifer Elaine LaGrange, Kevin James Minnick, and Jason D. Russell, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for Third-Party-Defendant-Appellant.

Whitney R. Case, Andrew Neil Friedman, and Victoria S. Nugent, Cohen Milstein Sellers & Toll, PLLC, Washington, D.C.; Mark Adam Griffin, David J. Ko, Karin B. Swope, and Harry Williams, Keller Rohrback LLP, Seattle, Washington; F. Paul Bland (argued), Public Justice, P.C., Washington, D.C., for Plaintiffs-Appellees.

Tyler Lawrence Farmer, Calfo Harrigan Leyh & Eakes, LLP, Seattle, Washington; Arthur W. Harrigan, Jr., Christopher T. Wion, Danielson Harrigan Leyh & Tollefson, LLP, Seattle, Washington, for Defendant-Third-Party-Plaintiffs-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

In June 2008, Plaintiff Donovan Lee purchased on the Internet a background check and report from Intelius. After Lee gave his credit card number and clicked to confirm his purchase, he was directed to a new webpage. Intelius was the only company name that appeared on that page. Lee clicked on a large orange button with the words "YES And show my report." Small print on the page indicated that he had thereby ostensibly obtained a seven-day free trial of a "Family Safety Report" and an obligation to pay $19.95 per month thereafter.

About a year later, Lee discovered that Adaptive Marketing ("Adaptive"), a separate company from Intelius, had been charging his credit card $19.95 per month for the "Family Safety Report." Lee and other named plaintiffs brought a state-law class action against Intelius. Intelius in turn filed a third-party complaint against Adaptive. Adaptive moved to compel arbitration of both Lee's and Intelius's claims. The district court denied the motion to compel. Adaptive appeals with respect to Lee, contending that Lee agreed to arbitration by clicking the orange button. We affirm.

## I. Background

Intelius is an internet-based company that performs background checks, people searches, and "reverse" telephone directory searches. Lee and his fiancée looked at Intelius's website together, and Lee purchased a background check using his credit card. After Lee made his purchase, he was directed to a new webpage. Intelius submitted to the district

court a copy of a webpage that it asserts is identical to the page seen by Lee.  We attach a copy of the webpage (unfortunately in black and white in the bound volume) as an appendix to our opinion.

At the top of the new webpage was a message in large black letters, "Thank You," and in smaller but still prominent black letters, "your order has been successfully completed." This was followed, also at the top of the page, by Intelius's colored logo; in large black letters, Intelius's name; and, in smaller black letters, Intelius's marketing slogan, "Live in the know."  Adaptive's name appeared nowhere on the webpage.

Immediately below the "Thank You" was a dark blue banner on which was written in large white and orange letters, "Take our 2008 Community Safety Survey and claim $10.00 CASH BACK when you try Family Safety Report." The "survey" consisted of two questions: (1) "Does your neighborhood have a sex offender alert program?" (Possible answers: Yes, No, I don't know); (2) "What card type did you use for your Intelius purchase today?" (Possible answers: Credit Card, Debit Card).  Below the survey, on the left-hand side of the page, was a box with an instruction in prominent white letters against a green background: "Please type your email address below."  Below that, in small, light grey print, was written, "By typing your email address below, it will constitute your electronic signature and is your written authorization to charge/debit your account *according to the Offer Details to the right*."  (Emphasis added.)  There were two spaces in which to type, and then to confirm, an email address.  Lee was not asked to resupply his credit card number.

Below the spaces for the email address was written, also in small, light grey print, "By clicking 'Yes' *I have read and agree to the Offer Details displayed to the right* and authorize Intelius to securely transfer my name, address, and credit/debit card information to Family Safety Report, a service provider of Intelius." (Emphasis added.) Below this was a large orange button with the words, written in prominent white letters, "YES And show my report." Below the orange button was a smaller button with the words, written in smaller, underlined dark grey letters, "No, show my report." The "report" to which the buttons referred was the report that Lee had just purchased from Intelius.

To the right of the box was a beige-colored box containing two paragraphs, written in small, light grey print that did not stand out prominently from the beige background. The paragraphs were headed by the words, also in small, light grey print, "OFFER DETAILS." The first paragraph was quite long. Inter alia, the paragraph stated that there was a "7-day FREE trial period" of the Family Safety Report, followed by a "membership fee of $19.95 per month . . . so long as you remain a member." The second paragraph, labeled "Disclaimers," was only three sentences long. The first two sentences stated, "Family Safety Report does not provide the Registered Sex offender Report. The report is administered and provided by Intelius and is *subject to their* Terms of Site Use and *Terms & Conditions*." (Emphasis added.)

Immediately below these two paragraphs were two hyperlinks labeled, in small, underlined black print, "Privacy Policy" and "Terms and Conditions." If Lee had clicked the "Terms and Conditions" hyperlink, he would have been sent to yet another webpage. This webpage contained a detailed

agreement titled "TERMS OF MEMBERSHIP AND MEMBERSHIP AGREEMENT." The first sentence stated, "The following is the Membership Agreement between the Provider of this Membership Program ('We' and 'Us') and the enrolled member of this Membership Program ('You')." The identity of the "Provider" was nowhere disclosed in the agreement; nor was the name Adaptive ever mentioned in the agreement. Paragraph 10 of the agreement was an arbitration clause.

Lee clicked on the orange "YES" button. In his deposition, he recalled that there had been a prominent "orange box, . . . in larger font, which drew our eye very quickly." He recalled noticing some grey text on the right-hand side of the screen. He testified in his deposition: "The block of text to the right on that screen was very small and, like, an off color; I think it was grey text, a little difficult to read. That's about all I remember." He testified that he did not read it. He did not recall clicking on a "terms and conditions" hyperlink. He testified that he did not realize he had been enrolled as a "member" of the Family Safety Report program until "midyear 2009," when he realized his bank account "balance was extremely low." He testified that he never received ten dollars "cash back." He stated that he called Intelius on the telephone to inquire about the monthly charges. The person he reached "could give [him] no information" about the charges. He cancelled his "membership" about a year after clicking on the orange button.

The district court described the relationship between Intelius and Adaptive:

Under a July 2007 agreement between Intelius and Adaptive Marketing, Intelius provides Adaptive access to consumers and receives revenue for each customer who accepts the offer of a free trial period. By the end of the first quarter 2008, almost 40% of Intelius' revenue came from Adaptive. When the 7-day trial period for an Adaptive product or service expires, the $19.95 monthly charge placed on the consumer's credit card does not identify Adaptive Marketing as the source of the charge and often consists of unintelligible abbreviations. Pursuant to their agreement, Intelius is prohibited from communicating with any customer with respect to an Adaptive Marketing product or service without Adaptive's prior written consent. Hundreds of Washington consumers have unknowingly enrolled in Adaptive Marketing programs while attempting to purchase an Intelius product. Despite complaints to Intelius, many consumers have been unable to obtain refunds from either Intelius or Adaptive.

We need not go into all the procedural details of the litigation. For present purposes, it is sufficient to say that Plaintiffs sued Intelius, that Intelius impleaded Adaptive as a third-party defendant, and that Adaptive then filed a motion to compel arbitration of both Intelius's and Lee's claims. The district court denied Adaptive's motion to compel. With respect to Lee's claims, the court held that Lee did not agree to arbitrate. It wrote, "Lee was asked to agree only to the 'Offer Details displayed to the right' and, given the language of those Details, would have no reason to go looking for other

terms and conditions that might apply." Adaptive appeals the denial of its motion to compel arbitration of Lee's claims.

## II.  Standard of Review

"We review the denial of a motion to compel arbitration de novo." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). We review "underlying factual findings . . . for clear error." *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009). We review de novo "[t]he interpretation and meaning of contract provisions." *Milenbach v. Comm'r*, 318 F.3d 924, 930 (9th Cir. 2003).

## III.  Discussion

The district court held that Lee entered into a contract with Adaptive to purchase the Family Safety Report but did not enter into a contract to arbitrate. The district court therefore denied Adaptive's motion to compel arbitration. Lee contends on appeal that he did not enter into a contract with Adaptive to purchase a "Family Safety Report." He contends, further, that even if he did enter into such a contract, he did not enter into a contract to arbitrate.

The parties agree that Washington law applies. For the reasons that follow, we hold that Lee did not enter into either a contract to purchase or a contract to arbitrate.

### A.  Contract to Purchase the Family Safety Report

In holding that Lee entered into a contract to purchase the Family Safety Report, the district court wrote:

> While the manner in which Adaptive
> presented its subscription service offer may
> support a finding of fraud in the inducement
> and/or unilateral mistake, such defenses do
> not alter the fact that a contract was entered
> into in the first instance. For purposes of
> determining whether a contract exists, it is
> Lee's objective manifestation of assent, rather
> than his subjective intent, that governs. . . .
> Lee objectively manifested assent when he
> clicked the "YES And show my report
> button."

We disagree and hold that Lee did not enter into a contract to purchase the Family Safety Report. This conclusion also necessarily entails a holding that Lee did not enter into a contract to arbitrate.

The webpage to which Lee was directed after he completed his purchase of the Intelius background check was designed to deceive him and others like him. The district court found that a "not unreasonable" consumer in Lee's position could have "reasonably believe[d]" that he was not purchasing an additional product or service by merely providing his email address and clicking on the orange button with the words "YES And show me my report." The court wrote:

> If the consumer is not interested in Family
> Safety Report, he would likely scan the page
> for a button or link that would, hopefully,
> reveal the report he had just purchased. A text
> box down the left side of the page contains all
> of the dominant design elements. Those

elements instruct the consumer to enter and confirm his email address, then provide a choice of [an orange] "YES And show my report" button or a smaller, gray "No, show my report" button.

A careful or suspicious consumer might conclude that further investigation is necessary because both buttons will apparently lead to the desired report. A less careful, but not unreasonable, consumer could conclude that providing Intelius with his email address and clicking the big [orange] "YES" button would reveal the report he had been trying to get for an undisclosed number of screens. Because the consumer never selects an additional product or service and is not asked for his account information, he could reasonably believe, based on his past experiences with internet transactions, that there would be no unpleasant surprises on his credit/debit account.

He would be wrong. . . . Taken in the context of the overall Intelius transaction, it is not surprising that a substantial number of Washington citizens unknowingly "accepted" the offered subscription service.

We are skeptical that Lee "objectively manifested assent" to the contract merely by providing and confirming his email address and by clicking on the prominent "YES" button. Under Washington law, a contract requires mutual assent to its essential terms in order to be binding. Although it is clear

that an electronic "signature" can be legally sufficient under Washington state law, *see* Wash. Rev. Code § 19.34.010(2), Washington courts have not decided whether or under what circumstances a "click" constitutes a signature. *Cf. Hauenstein v. Softwrap Ltd.*, No. C07-0572MJP, 2007 WL 2404624, at \*2 (W.D. Wash. Aug. 17, 2007) (noting that the plaintiff did not dispute that he manifested assent to a contract by "'clicking' the appropriate box"). In any event, the presence or absence of a signature, standing alone, is not determinative. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1166 (Wash. Ct. App. 2007). "The existence of mutual assent may be deduced from the circumstances." *Id.*

When Lee entered his email address and clicked on the large orange "YES" button, he had completed his purchase of the background check from Intelius but had not yet received a copy of his promised report. He did not re-enter his credit card number on the new webpage. The language on the "YES" button told him that the effect of clicking on that button would allow him to see the report he had already purchased. The critical text on the new webpage was written in small, light-colored print. We are skeptical that, under such circumstances, Lee objectively manifested assent to a contract. Nevertheless, because of the lack of clarity in Washington law surrounding whether and under what circumstances a click may constitute an objective manifestation of assent, we do not rest our conclusion that Lee did not enter into a contract on the ground that he did not manifest assent.

We rest our conclusion on another ground. Washington law requires that the "essential elements" of the contract be set forth in writing. An essential element is identification of

the parties to the contract.  *See Becker v. Wash. State Univ.*, 266 P.3d 893, 899 (Wash. Ct. App. 2011) (citing *DePhillips v. Zolt Constr. Co.*, 959 P.2d 1104, 1107 (Wash. 1998) (en banc)).  Adaptive admits that the contract must identify the contracting parties, though it contends that the parties need not be identified by name.  *See Bhd. State Bank v. Chapman*, 259 P. 391, 392 (Wash. 1927) (recognizing that a corporation or individual may contract or do business under an assumed name).  There is nothing on the new webpage offering the Family Safety Report, to which Lee was directed, that identified either Adaptive or an Adaptive-related entity as the party with which Lee was contracting.

Even an exceptionally careful consumer, who understood that he or she was being asked to enter into a contract for an additional product, would likely have thought that the contracting party was Intelius.  Adaptive's name appeared nowhere on the new webpage.  In contrast, Intelius's name and logo were prominently displayed at the top of the page, and Intelius was mentioned several times by name in the text. Adaptive contends in its brief that the words "Family Safety Report" "sufficiently described" an Adaptive-related entity for purposes of identifying the party with whom Lee contracted. We disagree.  Standing alone, the words "Family Safety Report" were more readily understood as referring to a report rather than to a company supplying a report.  It is true that parts of the text indicated that "Family Safety Report" was not itself a report.  For example, the first sentence under "Disclaimers" provided, "Family Safety Report does not provide the Registered Sex offender Report."  But this sentence did not make clear that the entity, "Family Safety Report," was not part of Intelius.  It is also true that the sentence just above the orange button said that the Family Safety Report was "a service provider of Intelius."  But this

sentence did not indicate that Family Safety Report was not part of Intelius. The preposition "of" (instead of "to") could easily be understood to indicate that Family Safety Report was part of Intelius. We therefore conclude that the webpage insufficiently identified Adaptive, or an entity affiliated with Adaptive, as a contracting party to support a conclusion that Lee entered into a contract with Adaptive to purchase the Family Safety Report.

Though it is not necessary to our holding, we note that the would-be contract that Adaptive is seeking to enforce is now illegal under federal law. Lee clicked on the orange button in June 2008. Two and a half years later, in December 2010, President Obama signed into law the Restore Online Shoppers' Confidence Act ("ROSCA"). ROSCA expressly prohibits the "data pass" method of sharing customers' credit card information with third-party sellers, as well as the practice of authorization of financial transactions by email address alone. *See* 15 U.S.C. § 8401 *et seq.*

## B.  Contract to Arbitrate

Arbitration provisions in contracts are governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* The Act provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a

> contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.* § 2. Our "role under the Act is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

The district court held that, even on the assumption that Lee entered into a contract to purchase the Family Safety Report, Lee did not enter into a contract to arbitrate. It wrote:

> Neither the text above the "YES" button nor the "Offer Details" themselves mention the "Privacy Policy" or the "Terms and Conditions." By clicking the "YES" button, Lee objectively manifested his assent to be bound by the "Offer Details," nothing more. The fact that there were additional hyperlinks on a webpage Lee reviewed does not establish assent to the terms embedded in those hyperlinks.

We agree.

The arbitration clause was contained in the "Terms and Conditions" that Lee would have seen only if he clicked on the hyperlink below "OFFER DETAILS" on the right-hand side of the webpage. The text on the left-hand side of the page twice directed a purchaser of the Family Safety Report to the "Offer Details." It stated, "By typing your email

address below, it will constitute your electronic signature and is your written authorization to charge/debit your account according to the Offer Details to the right" and "By clicking 'YES' I have read and agree to the Offer Details displayed to the right." The three-sentence second paragraph of the "Offer Details," located just above the "Terms and Conditions" hyperlink, stated in its second sentence, "The report is administered and provided by Intelius and is subject to their Terms of Site Use and Terms & Conditions." Intelius's "Terms and Conditions," to which Lee had already agreed, contained no agreement to arbitrate.

Even an exceptionally careful consumer would not have understood that a purchaser of the Family Safety Report, by clicking the orange button, was agreeing to anything more than the "Offer Details." That careful consumer would reasonably have understood, in light of the second sentence of the second paragraph, that the hyperlink to "Terms and Conditions" was to Intelius's rather than Adaptive's terms and conditions.

### Conclusion

We hold that Lee did not enter into a contract with Adaptive to purchase the Family Safety Report, and did not enter into a contract with Adaptive to arbitrate. We therefore affirm the district court. We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED and REMANDED.**

# APPENDIX

