**CHIRON CORPORATION, a Delaware corporation, Plaintiff–Appellee,**

v.

**ORTHO DIAGNOSTIC SYSTEMS, INC., a New Jersey corporation, Defendant–Appellant.**

No. 99–15064.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 2000

Filed March 28, 2000

Samuel R. Miller, Folger Levin & Kahn, San Francisco, California; Harold P. Weinberger and Gregory A. Horowitz, Kramer Levin Naftalis & Frankel, New York, New York, for the defendant-appellant.

Daniel H. Bookin and Patricia Schmiege, O'Melveny & Myers, San Francisco, California, for the plaintiff-appellee.

Before: HUG, Chief Judge, D.W. NELSON, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

This case requires us to decide whether the res judicata effect of a prior arbitration award on a subsequent arbitration is an issue to be determined by an arbitrator or by the court. We are not presented with a disagreement over whether the parties agreed to arbitrate. They clearly did, and the dispute falls squarely within their broad arbitration agreement. Rather, the issue before us is *who* should adjudicate the preclusive effect of a res judicata defense. Because res judicata is a legal defense that is necessarily intertwined with the merits, we join the Second Circuit in holding that this is a matter for the arbitrator. *See National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir.1996). Our holding is consistent with the strong federal policy favoring arbitration, *see Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), and with the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* We have jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3), *see Cook v. Erbey*, 207 F.3d 1104 (9th Cir.2000), and we affirm.

## BACKGROUND

In the late 1980s, Chiron Corporation, a biotechnology company, successfully developed and patented a blood test used to detect a previously unidentified form of hepatitis, the hepatitis C virus ("HCV"). Chiron also made significant strides in the development of AIDS-related blood tests, obtaining certain patents in that field. In 1989, Chiron and Ortho Diagnostic Systems, a wholly owned subsidiary of Johnson & Johnson, combined forces to undertake a joint business arrangement—a 50 year collaboration—aimed at developing, marketing, and selling Chiron's HCV and AIDS tests.

The parties memorialized the terms of this joint undertaking in a written agreement (the "Agreement"). Under the Agreement, Chiron assumed primary responsibility for research and manufacturing while Ortho assumed an exclusive license to the technology and primary responsibility for product development, distribution, marketing, and sales. The parties agreed to share equally all proceeds from the sale of the tests. All budgetary and strategic decisions were vested in a Supervisory Board comprised of three representatives from each company. In the event of a Board deadlock, the Agreement authorized Ortho to set the budget and strategic plan in its discretion for the succeeding year. Chiron and Ortho agreed to arbitrate "any dispute, controversy or claim arising out of or relating to" the Agreement.

In 1994 a dispute arose, ultimately leading Ortho to invoke the arbitration provision. The dispute stemmed from the parties' decision to expand the venture's marketing and sales efforts to diagnostic testing. The business initially focused its marketing efforts on blood screening, which refers to the series of tests routinely performed at blood banks on every unit of donated blood to protect the integrity of the blood supply. Diagnostic testing, on the other hand, refers to tests ordered by a physician to determine whether an

individual carries a particular virus. Unlike blood screening, diagnostic testing is usually conducted in laboratories using specialized equipment designed to accept a large number of blood samples and perform specified tests on each sample. Entry into the diagnostic testing market thus required the business to customize its AIDS and HCV tests for use on the diagnostic machines, otherwise known as "random access instruments." Through a series of unrelated transactions, Chiron and Ortho each secured ownership rights to competing random access instruments and, consequently, each company developed a strong interest in customizing the AIDS and HCV tests for use on its respective machine.

In setting the business's plan and budget for 1995, the Supervisory Board deadlocked as to which random access machine or machines the joint arrangement would focus its sales efforts. Per the terms of the Agreement, Ortho adopted a strategic plan and budget that authorized the venture to customize the blood tests for use only on Ortho's Vitros machine, effectively precluding use of the tests on Chiron's Centaur machine. When Chiron announced its intention to market the tests for use on its Centaur machine, Ortho objected, claiming that Chiron was prohibited from independently selling, marketing, or licensing the AIDS and HCV tests outside the joint arrangement.

To arbitrate their dispute, the parties chose former federal district judge Joseph W. Morris, who issued his arbitration decision in April 1997. He determined that in light of the deadlock, the express terms of the Agreement gave Ortho the right to establish the budget and strategic plan for the successive year. He further concluded that Ortho's decision to limit the sale of the tests to the Vitros machine was permitted so long as Ortho continued to share all profits with Chiron. The arbitration award "constitute[d] a full and complete resolution of all claims and counterclaims submitted or urged by either party in this Arbitration," and was "final and binding upon the parties."

Following Judge Morris's decision, Chiron submitted a new proposal to Ortho that involved amending both the then-current 1997 and the 1998 strategic plans and budgets to allow the joint business access to the Centaur. Although Chiron maintained that such an amendment would serve the parties' stated intent by maximizing the business's profits, Ortho rejected Chiron's proposal without submitting it to all members of the Supervisory Board. Chiron viewed Ortho's rejection as violating certain sections of the Agreement that address the parties' intent—to maximize both the profits of each company as well as the commercial potential of the AIDS and HCV test technology—and that spell out the Supervisory Board's duty to approve amendments to the plan and budget "from time to time." Chiron sought a second arbitration proceeding to resolve the disagreement. Ortho, however, refused on the ground that the new claims raised by Chiron were the same as the claims presented to Judge Morris and were thus precluded from further arbitration under the doctrine of res judicata.

Chiron filed a declaratory judgment action seeking an order compelling arbitration and later moved for such an order under § 4 of the Federal Arbitration Act ("FAA" or "Act"). Ortho filed a cross-motion for summary judgment on the ground that the earlier arbitration award operated as res judicata to all claims Chiron sought to raise in a second arbitration proceeding. Ortho also sought an order confirming the earlier arbitration award under § 9 of the FAA. Applying federal law, the district court concluded that Ortho's res judicata defense was itself an arbitrable issue within the scope of the parties' agreement to arbitrate. The Court without reaching the merits of Ortho's objection therefore granted Chiron's motion to compel arbitration and denied Ortho's motion for summary judgment. The court also granted Ortho's motion to confirm the arbitration award. This appeal stems from Ortho's timely appeal of

the district court's grant of Chiron's motion to compel arbitration.

## ANALYSIS

■ We review de novo the district court's decision to compel arbitration. *See Quackenbush v. Allstate Ins. Co.,* 121 F.3d 1372, 1380 (9th Cir.1997). We begin our analysis by recognizing that an agreement to arbitrate is a matter of contract: "it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). As with any other contract dispute, we first look to the express terms which in this case require Chiron and Ortho to arbitrate "[a]ny dispute, controversy or claim arising out of or relating to the validity, construction, enforceability or performance" of the Agreement. The Agreement sets forth specific procedures that govern the initiation of an arbitration proceeding and the manner in which it is conducted, and provides that the resulting decision "shall be final and not appealable." These express terms unambiguously reflect the parties intent both to arbitrate disputes arising from the joint business and to be bound by the arbitration decisions that resolve such disputes. It is against this backdrop that we turn to the governing provisions of the Act.

## I. Federal Arbitration Act

■ Because the Agreement is "a contract evidencing a transaction involving commerce," it is subject to the FAA. 9 U.S.C. § 2. The FAA provides that any arbitration agreement within its scope "shall be valid, irrevocable, and enforceable," *id.,* and permits a party "aggrieved by the alleged ... refusal of another to arbitrate" to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement. *Id.* at § 4. By its terms, the Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *See* 9 U.S.C. § 4; *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 719–20 (9th Cir.1999); *see also Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 477–78 (9th Cir.1991). If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms.

### A. Governing Law

■ As a threshold matter, Ortho claims that the district court erred in concluding that federal law governs, pointing to the Agreement's choice-of-law provision that provides "[t]his agreement shall be construed and interpreted according to the laws of the State of New Jersey." The Supreme Court rejected a similar argument in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), holding that the parties' inclusion of a choice-of-law clause in the arbitration agreement does not incorporate state decisional law pertaining to the allocation of power between courts and arbitrators; rather, at most the clauses read together create an ambiguity that must be construed in favor of arbitration. *Id.* at 62, 115 S.Ct. 1212. "We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read [the former] to encompass substantive principles that [state] courts would apply, but not to include special rules limiting the authority of arbitrators[,]" notwithstanding otherwise-applicable federal law. *Id.* at 63–64, 115 S.Ct. 1212.

Ortho argues that the governing law issue is resolved by the Supreme Court's analysis in *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University,* 489 U.S. 468, 109

S.Ct. 1248, 103 L.Ed.2d 488 (1989), rather than by *Mastrobuono*. This reliance is misplaced. In *Volt*, the Court declined to review the merits of the state court's determination that the parties' choice-of-law provision was intended to encompass both the state's substantive law as well as its rules of arbitration. Guided by *Mastrobuono*, we have rejected the very argument that Ortho makes here:

> Unlike the *Volt* Court, which declined to review a state court's interpretation of a private contract, we must interpret the Development Agreement between Wolsey and Foodmaker. In *Mastrobuono*, the Supreme Court distinguished *Volt* as follows:
>
>> "... In *Volt*, however, we did not interpret the contract de novo. Instead, we deferred to the California court's construction of its own state law. In the present case, by contrast, we review a federal court's interpretation of this contract...."
>
> *Mastrobuono*, 514 U.S. at 60 n. 4, 115 S.Ct. 1212. Thus, in interpreting the Development Agreement, we are bound by *Mastrobuono*, not by *Volt*. Because *Mastrobuono* dictates that general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators, the district court erred in applying [the California rule] to deny Foodmaker's motion to compel arbitration.

*Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1212–13 (9th Cir.1998). In light of *Mastrobuono* and *Wolsey*, the district court correctly found that the federal law of arbitrability under the FAA governs the allocation of authority between courts and arbitrators.

### B. Arbitrability of the Dispute

■■ Because the parties do not challenge the validity of the Agreement, the FAA restricts our review to deciding only whether the dispute is arbitrable, that is, whether it falls within the scope of the parties' agreement to arbitrate. In so doing, we must be cognizant of the Act's federal policy favoring arbitration agreements:

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Accordingly, "[o]ur role is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator." *Republic of Nicaragua*, 937 F.2d at 478.

The record here leaves little doubt that the dispute is subject to arbitration, and Ortho does not seriously challenge this point. The parties' arbitration clause is broad and far reaching: "Any dispute, controversy or claim arising out of or relating to the validity, construction, enforceability or performance of this Agreement shall be settled by binding Alternate Dispute Resolution ('ADR') in the manner described below." In general terms, the current dispute centers on whether Ortho violated certain provisions of the joint agreement or the implied covenant of good faith and fair dealing by allegedly refusing to consider the proposed amendment to the 1997 and 1998 plans and budgets. Resolution of the dispute would require an analysis of the specific provisions of the Agreement as well as an evaluation of evidence relating to the alleged breach. The dispute unquestionably arises out of or relates "to the construction, enforceability or performance" of the Agreement and therefore falls within the parties' agreement to arbitrate. Accordingly, as the FAA "leaves no place for the exercise of discretion by a district court .... [,]" the district court was correct in finding that the dispute is arbitrable. *Dean Witter*, 470 U.S. at 218, 105 S.Ct. 1238.

## II. Arbitrability of Res Judicata Defense

Recognizing that the dispute itself is subject to arbitration, Ortho attempts to shift the debate by arguing that, unlike a determination on the merits of a claim, the defense of res judicata is not arbitrable. Whether Ortho's res judicata objection to Chiron's claims is itself arbitrable also raises the separate issue of *who* determines the preclusive effect of an earlier arbitration award, the court or the arbitrator. Chiron counters that a res judicata defense goes to the merits of the dispute and is thus arbitrable under the broad terms of the parties' arbitration agreement. Ortho, on the other hand, points out that the district court entered judgment upon the arbitration award as provided for by § 9 of the Act. Relying on cases from other circuits, Ortho argues that because courts generally determine the preclusive effect of a court judgment on a subsequent court proceeding, the court rather than an arbitrator should reach the merits of its res judicata objection. We address each argument in turn.

The simplest answer to Ortho's argument is to look once again at the parties' agreement, which requires arbitration of "any" dispute. Nowhere is the defense of res judicata treated differently or singled out for exclusion. Rather, Ortho's argument to treat res judicata as a special case appears premised on the notion that the court will make a better decision than the arbitrator or that it is somehow unfair to leave this issue to an arbitrator. We need not go down that path. Ortho already opted to arbitrate all disputes arising under the Agreement and this election was not a casual one, evidenced by not only an unambiguous arbitration clause, but also by the negotiated, detailed, and extensive procedures for alternate dispute resolution that were included in the joint business agreement.

The question of whether Ortho's res judicata defense to arbitration is itself an arbitrable issue is bound up with the question of who should make such a determination. Although we have not had previous occasion to consider this issue, we find the Second Circuit's analysis persuasive: a res judicata objection based on a prior arbitration proceeding is a legal defense that, in turn, is a component of the dispute on the merits and must be considered by the arbitrator, not the court. *See National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir. 1996); *see also John Hancock Mutual Life Ins. Co. v. Olick*, 151 F.3d 132 (3d Cir. 1998) (holding res judicata objection based on prior arbitration is issue to be arbitrated under National Association of Securities Dealers arbitration procedures).

In the case before the Second Circuit, Belco objected to National Union's petition to compel arbitration on grounds similar to those raised by Ortho, namely that the preclusive effect of a prior arbitration award must be determined by the court, not the arbitrator. Belco argued that its preclusion defense did not require an interpretation of the arbitration agreement and thus fell outside the scope of "arbitrable" issues. The court disagreed:

> The preclusion issue is not ... a disagreement over "whether [the parties] agreed to arbitrate the merits" of their dispute. Belco's claim of preclusion is a legal defense to National Union's claim. As such, it is itself a component of the dispute on the merits. Belco's attempt to characterize the preclusion issue as not related to the merits is unavailing. It is as much related to the merits as such affirmative defenses as a time limit in the arbitration agreement or laches, which are assigned to an arbitrator under a broad arbitration clause similar to the one [here].

*Belco*, 88 F.3d at 135–36 (citations omitted).

*Belco* is directly on point—it addresses who determines the effect of a prior arbitration award on a subsequent demand for arbitration. Ortho's reminder that the doctrine of res judicata serves to avoid future litigation of the same dispute side-

steps the issue of *who* decides the res judicata issue in these circumstances. Ortho's further suggestion that sending the matter to arbitration is somehow unfair because it will be litigating the same matter twice assumes that Ortho is correct in its comparison of the claims between the first arbitration and this one. This bootstrap approach does not further the debate of *who* should determine res judicata and, in any event, we need not address this issue as it falls within a merits analysis that is subject to arbitration under the parties' agreement.

Ortho urges us to ignore the *Belco* rationale and, alternatively, look to other provisions of the FAA to support its position that the court should reach the merits of its res judicata defense. Pursuant to Ortho's request, the district court entered judgment upon the arbitration award under § 13 of the FAA. Citing cases from other circuits,[1] Ortho argues that because § 13 treats an arbitration judgment the same as a court judgment, the court should determine its preclusive effect.

By its terms, the Agreement provides that "[a]ny judgment upon the award rendered by the neutral may be entered in any court having jurisdiction thereof." The FAA, in turn, permits any party to an arbitration to petition the court for an order confirming the award. *See* 9 U.S.C. § 9. The resultant judgment "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action." 9 U.S.C. § 13. Relying on the language of the statute, Ortho argues that we must treat the district court's confirmation of the arbitration award as if it were a judgment rendered in a judicial proceeding. This approach, however, begs the question because the statute says nothing about which forum or *who* determines the effect of the judgment. Moreover, it obscures the fact that while a judgment entered upon a confirmed arbitration award has the same force and effect under the FAA as a court judgment for enforcement purposes, it is not wholly parallel to a court judgment for all purposes.

Indeed, there are fundamental differences between confirmed arbitration awards and judgments arising from a judicial proceeding. Absent an objection on one of the narrow grounds set forth in sections 10 or 11,[2] the Act requires the court to enter judgment upon a confirmed arbitration award, without reviewing either the merits of the award or the legal basis upon which it was reached. A judgment upon a decision or order rendered by the court at the conclusion of a judicial proceeding, by contrast, confirms the merits of that decision. Along the same lines, a judgment under § 13 of the FAA is not subject to Federal Rules of Civil Procedure 59 or 60 whereas a judgment arising from a judicial proceeding is subject to reopening and challenge under those rules.[3] And, unless the provisions of the parties' agreement provides to the contrary, there is no right under the FAA to appeal the merits of a confirmed arbitration award. In sum, a judgment upon a confirmed arbitration award is qualitatively different from a judgment in a court

1. *See In re Y & A Group Securities Litigation,* 38 F.3d 380 (8th Cir.1994); *Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 985 F.2d 1067 (11th Cir.1993); *Miller Brewing Co. v. Fort Worth Distributing Co., Inc.,* 781 F.2d 494 (5th Cir.1986); *see also Miller v. Runyon,* 77 F.3d 189, 193–94 (7th Cir.1996) (discussing issue and collecting cases).

2. Sections 10 and 11 permit a district court to vacate or modify an arbitration award under limited circumstances unrelated to the merits. For example, a court may vacate an award procured by corruption, fraud or undue means or rendered by a partial or corrupt arbitrator. *See* 9 U.S.C. § 10(a)(1), (2). Also, a court may modify an award to correct an obvious material miscalculation of figures or an imperfection in matter of form not affecting the merits. *See* 9 U.S.C. § 11(a), (c).

3. Rules 59 and 60 permit a court to reconsider and amend its own judgments in certain situations. Rule 59 authorizes the court to amend a judgment in the context of a motion for new trial, whereas Rule 60 governs amendments that arise from clerical mistakes or from the court's decision to relieve a party from a judgment on one of several specified grounds.

proceeding, even though the judgment is recognized under the FAA for enforcement purposes.

Even were we to accept Ortho's position that § 13 requires us to treat a confirmed arbitration award as a court judgment for all purposes, the primary cases on which Ortho relies are distinguishable in that both involved the court determining the res judicata effect of its *own* prior judgment on a subsequent arbitration proceeding. *See In re Y & A Group Securities Litigation,* 38 F.3d 380 (8th Cir.1994); *Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 985 F.2d 1067 (11th Cir.1993). In *In re Y & A,* for example, the Eighth Circuit premised its holding on the court's inherent authority to defend its own judgments as res judicata, a power the court found to include the authority to enjoin or stay subsequent arbitration proceedings: "[t]he district court, and not the arbitration panel, is the best interpreter of its own judgment." *In re Y & A Group,* 38 F.3d at 383. The Eleventh Circuit similarly relied on this rationale, noting that "[c]ourts should not have to stand by while parties re-assert claims that have already been resolved." *Kelly,* 985 F.2d at 1069. This justification rests on the presumption that the court issuing the original decision is best equipped to determine what was considered and decided in that decision and thus what is or is not precluded by that decision. The policy underlying these decisions is not served in this case, however, when the district court merely confirmed the decision issued by another entity, the arbitrator, and was not uniquely qualified to ascertain its scope and preclusive effect. Nor do these cases take into consideration the FAA's policy limiting the role of the court once arbitrability is determined.

Like the agreement in *Belco,* Chiron and Ortho's arbitration agreement is undeni-

ably broad. Ortho's res judicata defense to a subsequent arbitration proceeding necessarily involves an inquiry into Chiron's underlying claims. As with other affirmative defenses [4] such as laches and statute of limitations, we agree with the Second Circuit that a res judicata defense is a "component" of the merits of the dispute and is thus an arbitrable issue.

### CONCLUSION

The court's role under the Federal Arbitration Act is limited to enforcing the agreement to arbitrate between Chiron and Ortho. Their broad arbitration clause binds them to arbitrate "any dispute, controversy or claim arising out of or relating to" the Agreement. Because Ortho's res judicata objection to Chiron's petition to compel arbitration is intertwined with the merits of the dispute, it too falls within the scope of the agreement to arbitrate. Accordingly, we AFFIRM the district court's order to compel arbitration.

---

4. For guidance in characterizing res judicata and other defenses, we look to Rule 8(c) of the Federal Rules of Civil Procedure, which requires parties to affirmatively plead a res judicata defense, as well as eighteen other enumerated defenses and a catch-all provi-

sion, including estoppel, laches, and statute of limitations.