Opinion by Judge TASHIMA; Partial Concurrence and Partial Dissent by Judge GILMAN.
OPINION
TASHIMA, Circuit Judge:
These consolidated appeals arise out of an antitrust action brought by a group of West Coast fishermen against Frank Dul-cich, the West Coast seafood processor entities owned by Dulcich (collectively, “Pacific Seafood”), and Ocean Gold Sea-foods, Inc. (“Ocean Gold”), another West Coast seafood processor, which was commenced in 2010 and settled in 2012. Their settlement is documented in a Resolution Agreement.
In December 2014, Pacific Seafood informed the other parties to the Resolution Agreement, including several who are now plaintiffs in the instant action, that Pacific Seafood was planning to acquire Ocean Gold. Plaintiffs, a second group of West Coast fishermen,[1] then filed the present action against Dulcich, Pacific Seafood, and an Ocean Gold entity (collectively, “Defendants”), alleging antitrust Claims under the Sherman Act and the Clayton Act.
Plaintiffs moved for a preliminary injunction to enjoin the acquisition pendente lite, which the district court granted. Defendants then filed a motion to compel arbitration, arguing that the dispute should be arbitrated pursuant to a provision in the Resolution Agreement. The district court denied this motion.
Defendants now appeal the district court’s decisions granting the preliminary injunction and denying the motion to compel arbitration. We have jurisdiction over the appeal from the order granting the preliminary injunction under 28 U.S.C. § 1292(a)(1). We have jurisdiction over the appeal from the order denying Defendants’ motion to compel arbitration under *1016 9 U.S.C. § 16(a)(1)(C). We affirm both decisions.
I.
A. The 2010 Litigation: Whaley v. Pacific Seafood Group
In 2010, a group of West Coast fishermen (the “Whaley plaintiffs”) sued Frank Dulcich, Pacific Seafood, and Ocean Gold in the District of Oregon. The Whaley plaintiffs — and Plaintiffs here — sell their catch to processors such as Pacific Seafood and Ocean Gold, and seek to insure competition between the buyers of their fish. The Whaley plaintiffs alleged that the defendants had engaged in a conspiracy to restrain trade in, as well as monopolization and attempted monopolization of, multiple West Coast seafood markets.
Within a few months of filing suit, the Whaley plaintiffs learned that Pacific Seafood was planning to acquire Ocean Gold and its affiliated companies. They filed for a temporary restraining order to halt the proposed transaction. Defendants then represented to the district court and the Whaley plaintiffs that they had terminated the transaction, and that they would not pursue it again without prior notice to the plaintiffs and the Oregon Attorney General.
Throughout the course of the Whaley litigation, Pacific Seafood and Ocean Gold were parties to an exclusive marketing contract, under which Pacific Seafood acted as the exclusive marketer and distributor of Ocean Gold’s products. This agreement was set to expire in 2016.
The' Whaley litigation continued for twenty months. From February to March 2012, the parties engaged in settlement negotiations, mediated by then-Senior District Judge Michael Hogan. The parties filed a Stipulation and Resolution Agreement of Class Action Claims (the “Resolution Agreement”) in April 2012. The district court entered a Judgment and Order of Dismissal on May 21, 2012.
In the Resolution Agreement, the Wha-ley defendants agreed not to renew Pacific Seafood and Ocean Gold’s exclusive marketing contract when it expired in 2016. Additionally, in Paragraph 3(a) of the Resolution Agreement, defendants agreed that, if Pacific Seafood and Ocean Gold were to “enter into any new agreement that requirefd] Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Sea-foods,” Pacific Seafood and Ocean Gold would give 60-days’ notice to plaintiffs’ counsel and the Oregon Department of Justice. Objections to the new contractual arrangement were to be submitted to Judge Hogan, or, if he were unavailable, Magistrate Judge John Jelderks, for resolution. If Judge Hogan, or his successor, were to determine that the new agreement were “pro-competitive ... it may be approved.”
B. The 2015 Litigation: Boardman v. Paciñc Seafood Group
In December 2014, counsel for Frank Dulcich and Pacific Seafood informed lead plaintiffs’ counsel in the Whaley litigation that Pacific Seafood again intended to acquire Ocean Gold’s stock. Plaintiffs’ counsel then, conducted an investigation into this proposed acquisition, and learned that Pacific Seafood and Ocean Gold had been negotiating the proposed transaction for 15 months.. On January 21, 2015, plaintiffs’ counsel asked defendants’ counsel whether the transaction was scheduled to close in the near future, and defendants’ counsel replied that he did not know.
Plaintiffs, a second group of West Coast fishermen,[2] then filed this action against *1017 Pacific Seafood, an Ocean Gold entity (Ocean Gold Holding Co., Inc.), and Dul-cich (collectively, “Defendants”) on January 22, 2015, alleging monopolization and attempted monopolization under § 2 of the Sherman Act, and requesting a declaratory judgment that Pacific Seafood’s proposed acquisition of Ocean Gold violated the Whaley Resolution Agreement.[3] Plaintiffs also applied for a temporary restraining order to halt Pacific Seafood’s proposed acquisition of Ocean Gold, which the district court granted.
Plaintiffs then moved for a preliminary injunction, after which Defendants filed a stipulation stating that the Oregon Attorney General had begun an investigation into Pacific Seafood’s proposed acquisition of Ocean Gold, and that Defendants agreed that they would not “enter into any purchase transaction” with respect to Ocean Gold while the investigation was pending. Further, that Defendants could terminate the stipulation “upon 60-days’ prior notice to the Oregon Attorney General and the Court.”
The district court (Judge McShane) granted Plaintiffs’ preliminary injunction motion. The preliminary injunction prohibited defendants “from undertaking any further act to acquire or control any interest in” Ocean Gold’s stock or assets. Defendants timely appeal from the decision granting the preliminary injunction.
About a month after the preliminary injunction was granted, Defendants filed a motion to compel arbitration, arguing that Plaintiffs were obligated to submit their objection to Pacific Seafood’s proposed acquisition of Ocean Gold to Magistrate Judge Jelderks, the replacement for now-retired Judge Hogan, for arbitration under Paragraph 3(a) of the Whaley Resolution Agreement. The district court (Judge Panner) denied Defendants’ motion, holding that Plaintiffs’ claims did not fall within the scope of Paragraph 3(a). Defendants timely appeal the denial of their motion to compel arbitration.
These consolidated appeals are now beT fore this Court.
II.
We review a district court’s denial of a motion to compel arbitration de novo. See Brown v. Dillard’s, Inc., 430 F.3d 1004, 1009 (9th Cir.2005).
We review a district court’s grant of a preliminary injunction for an abuse of discretion. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1119 (9th Cir.2009). A district court abuses its discretion if it “base[s] its decision on an erroneous legal standard or on clearly erroneous findings of fact.” Id. (quoting FTC v. Enforma Nat. Prods., Inc., 362 F.3d 1204, 1211-12 (9th Cir.2004)).
III.
A. The Framework for Analyzing a Motion to Compel Arbitration
Section 2 of the Federal Arbitration Act (“FAA”) makes enforceable a written arbitration provision in “a contract evidencing a transaction involving commerce.” Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir.2000). When a contract meets this requirement, a court is “limited to determining (1) whether a valid agreement to arbitrate exists [within the contract] and, if it does, (2) whether the agreement encompasses the dispute at issue.” Id. If so, the court must compel arbitration. See id. at 1134.
*1018 To interpret the parties’ contract, a court should look to “general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.” Wagner v. Stratton Oakmont, Inc., 83 F.3d 1046, 1049 (9th Cir.1996). Under Oregon law, “[t]o interpret a contractual provision ... the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole. If the provision is clear, the analysis ends.” Yogman v. Parrott, 325 Or. 358, 937 P.2d 1019, 1021 (1997) (en banc). If, on the other hand, the provision is ambiguous, the court “examine[s] extrinsic evidence of the contracting parties’ intent.” Id. at 1022. If this step does not resolve the ambiguity, the court looks to appropriate canons of construction for guidance. Id.
B. Plaintiffs’ Claims Are Not Within the Scope of Paragraph 3(a) of the Resolution Agreement
Because Plaintiffs’ claims are not within the scope of the purported arbitration provision in the Resolution Agreement, we conclude that the district court did not err in denying Defendants’ motion to compel arbitration.[4]
Defendants contend that: (1) the FAA applies to the Resolution Agreement; (2) Paragraph 3(a) of the Resolution Agreement includes a valid agreement to arbitrate; (3) the agreement to arbitrate encompasses Plaintiffs’ suit; and (4) the Court must therefore compel arbitration of the instant action.
Because the FAA applies only to arbitration provisions in “eontract[s] evidencing a transaction involving commerce,” see Chiron Corp., 207 F.3d at 1130, we must first determine whether the Resolution Agreement is such a contract. The Resolution Agreement settled claims regarding seafood processors’ purchases of fish from fishermen on the West Coast;[5] accordingly, it evidences a transaction involving commerce.. See generally Rogers v. Royal Caribbean Cruise Line, 547 F.3d 1148, 1154 (9th Cir.2008) (explaining that the Supreme Court has adopted a broad interpretation of the phrase “evidencing a transaction involving commerce”).
Thus, the district court would have been obligated to compel arbitration of Plaintiffs’ claims if the Resolution Agreement contained a valid agreement to arbitrate, and if that arbitration provision encompassed this dispute. Chiron Corp., 207 F.3d at 1130. We need not decide whether Paragraph 3(a) of the Resolution Agreement constitutes a valid agreement to arbitrate because we conclude that Plaintiffs’ claims are not encompassed by Paragraph 3(a)’s plain language.
Paragraph 3(a) of the Resolution Agreement provides:
The February 9, 2006 Agreement between Pacific Seafood Group and Ocean Gold Seafoods, will not be renewed in 2016. In the event that the [sic ] Pacific Seafood and Ocean Gold intend to enter *1019 into any new agreement that requires Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods, Pacific Seafood and Ocean Gold shall first give 60 days’ notice to class counsel and the Oregon Department of Justice and an opportunity to object to the agreement. In the event of an objection to the new contractual arrangement, Judge Hogan shall determine whether the proposed new agreement is pro-competitive and if so, it may be approved.
Because of the federal policy in favor of arbitration, ambiguities regarding the scope of arbitrable issues are to be resolved in favor of arbitration. Id. at 1131. At the same time, arbitration is a matter of contract, and a “party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.” See Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir.2014) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).
In Paragraph 3(a) of the Resolution Agreement, the parties to the Whaley lawsuit agreed to submit to then-Senior District Judge Hogan, or his replacement, Magistrate Judge Jelderks, disputes regarding “any new agreement that requires Pacific Seafood Group to act as the exclusive marketer of any seafood product produced by Ocean Gold Seafoods.” The purchase and sale agreements for stock and other interests between Pacific Seafood and Ocean Gold that led to the current suit do not pertain to marketing. They do not deal with the marketing of Ocean Gold’s products in any explicit way, exclusive or otherwise. Instead, they detail Pacific Seafood’s plan to purchase Ocean Gold’s stock and other interests.
Pacific Seafood argues that the purchase agreements functionally require it to act as the exclusive marketer of Ocean Gold’s products, by virtue of its contemplated ownership of Ocean Gold’s stock and other interests. But the owner of a company is not necessarily that company’s exclusive marketer, just as under the former exclusive marketing agreement, Ocean Gold was not the marketer of its own products. The owner of a company may have the right to act as the exclusive marketer of the company’s products, but there is no requirement that it do so. The parties could have drafted the provision more broadly to require any objections to a proposed merger or other combination of Pacific Seafood and Ocean Gold, or to any modification of their relationship, to be submitted to Judge Hogan for resolution, but they did not. Instead, the provision only includes objections to a new agreement that requires Pacific Seafood to act as the exclusive marketer of Ocean Gold’s products.[6] The purchase and sale agreements at issue in this litigation are thus not fairly encompassed by this provision of the Resolution Agreement. Regardless of whether the provision constitutes a valid agreement to arbitrate, Plaintiffs’ claims are not within the scope of Paragraph 3(a). Accordingly, the district court’s order denying Defendants’ motion to compel arbitration is affirmed.[7]
*1020 IV.
A. The Framework for Analyzing Preliminary Injunctions
To obtain a preliminary injunction, a plaintiff must demonstrate that: (1) it “is likely to succeed on the merits”; (2) it “is likely to suffer irreparable harm in the absence of preliminary relief’; (3) “the balance of equities tips in [its] favor”; and (4) “an injunction is in the public interest.” Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). We hold that the district court did not abuse its discretion in finding that Plaintiffs satisfied each of these requirements and granting their motion for a preliminary injunction.
B. Plaintiffs Have Shown a Sufficient Likelihood of Success on the Merits
1. Plaintiffs Did Not Release Their Claims in the Prior Settlement
Defendants argue that Plaintiffs cannot show a likelihood of success on the merits of their monopolization and unlawful merger claims because they released these claims in the Resolution Agreement. When settling the Whaley lawsuit, Plaintiffs agreed to release the following:
Any and all claims for monopolization, attempted monopolization or conspiracy to restrain trade under Sections 1 and 2 of the Sherman Act that relate to the delivery of trawl-caught groundfish, whiting or pink shrimp to West Coast processors from Ft. Bragg, California north to the Canadian border between June 21, 2006 and December 31, 2011 and specifically including any claims for damages and/or injunctive relief related to those claims.
As required by Oregon contract law, we interpret the above provision by examining its text; if the provision is cléar, its plain text governs. See Yogman, 937 P.2d at 1021. Plaintiffs argue that the entire release is temporally limited (that is, only claims arising between June 21, 2006 and December 31, 2011 were released), while Defendants argue that the last clause of the provision (“including any claims for damages and/or injunctive relief related to those claims”) is not so limited, and thus encompasses the claims at issue in this *1021 case. We agree with Plaintiffs and conclude that they did not release their current claims when they settled the Whaley lawsuit.
Defendants read the last clause of the release expansively to mean that the Wha-ley plaintiffs released all claims for damages or injunctive relief related to — which Defendants define to mean “logically or causally connected to” — the claims asserted in Whaley. By this logic, the Whaley plaintiffs released their antitrust claims against Defendants that arose between June 21, 2006 and December 31, 2011, and any related claims for damages or injunc-tive relief arising at any time before or after. This construction would render the temporal limitation in the first clause meaningless.
We decline to reach this illogical result, and we instead read the second clause in the context of the provision as a whole. The release states that the claims in the first clause, which are temporally limited, “specifically includ[e]” the claims in the second clause — the “related” claims for “damages and/or injunctive relief.” Thus, the claims in the second clause are a smaller subset of the temporally limited claims in the first clause. See, e.g., Ariz. State Bd. for Charter Sch. v. U.S. Dep’t of Educ., 464 F.3d 1003, 1007-08 (9th Cir.2006) (“Using a common-sense construction ..., the term ‘including’ indicates that [which follows] is an illustrative subset of the preceding principle .... ”). The release in the Resolution Agreement is clear: the Whaley plaintiffs released their antitrust claims against Defendants that arose between June 2006 and December 2011, which specifically included plaintiffs’ claims for damages and injunctive relief that arose during the specified time . period. Accordingly, we conclude that the release in the Resolution Agreement has no bearing on Plaintiffs’ likelihood of success on the merits of their claims in this case, which arose after the Resolution Agreement was executed.
2. Plaintiffs Have Adequately Demonstrated That the Proposed Transaction Could Substantially Lessen Competition
To prove an unlawful merger claim under § 7 of the Clayton Act, a plaintiff must show that the effect of the challenged acquisition “may be substantially to lessen competition, or to tend to create a monopoly.” 15 U.S.C. § 18. The plaintiff need not prove that a merger or acquisition has altered prices in the relevant market; rather, “[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future.” Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke’s Health Sys., Ltd., 778 F.3d 775, 788 (9th Cir.2015) (quoting Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1389 (7th Cir.1986)).
This Court evaluates § 7 claims “under a burden-shifting framework.” Id. at 783. “A prima facie case can be established simply by showing a high market share” would result from the proposed merger, although plaintiffs often put forth other evidence as well, because market share statistics do not conclusively prove harm to competition. Id. at 785. The burden then shifts to the defendant to “cast doubt on the accuracy of the [plaintiff’s] evidence as predictive of future anti-competitive effects.” Id. at 788 (quoting Chi. Bridge & Iron Co. N.V. v. FTC, 534 F.3d 410, 423 (5th Cir.2008)).
Plaintiffs have adduced evidence that, if Pacific Seafood were to acquire Ocean Gold, Pacific Seafood’s market power in seafood input markets[8] on the West *1022 Coast would increase significantly, to the point that the markets would become “highly concentrated.” To support their argument, Plaintiffs have utilized the Her-findahl-Hirschman Index, which is “[a] commonly used metric for determining market share,” Saint Alphonsus Med. Ctr., 778 F.3d at 786, as well as the U.S. Department of Justice’s and Federal Trade Commission’s Horizontal Merger Guidelines. Plaintiffs’ expert, Dr. Radtke, also submitted a declaration explaining that there were “multiple barriers to entry in the West Coast seafood market.”
To “cast doubt” on Plaintiffs’ “evidence as predictive of future anticompetitive effects,” Defendants respond that Pacific Seafood and Ocean Gold have been cooperating for nearly 15 years, with Pacific Seafood acting as the sole buyer of Ocean Gold’s seafood output, using Ocean Gold’s seafood processing assets, and offering marketing and distribution services to Ocean Gold in return. According to Defendants, the companies’ joint efforts have improved the industry by increasing ex vessel prices[9] and expanding the market. In other words, Defendants claim that Pacific Seafood’s acquisition of Ocean Gold would merely continue the companies’ joint efforts and not change the current market structure. Defendants argue that, as a result, the proposed acquisition poses no danger to competition.
Plaintiffs respond that Pacific Seafood’s acquisition of Ocean Gold would indeed change the relevant market structure, which is that of input markets on the West Coast. In West Coast input markets for trawl-caught groundfish, Pacific whiting, and Pacific coldwater shrimp, Ocean Gold and Pacific Seafood are currently competitors, though they cooperate in other respects. Thus, according to Plaintiffs, Pacific Seafood’s acquisition of Ocean Gold would substantially decrease competition in multiple seafood input markets.
The district court found convincing Plaintiffs’ showing that Pacific Seafood’s acquisition of Ocean Gold would substantially reduce competition in multiple buyers’ input markets, and it found that Defendants had not sufficiently cast doubt on Plaintiffs’ evidence to meet their burden. This conclusion is supported by the evidence in the record summarized above, and it was not implausible in light of the record as a whole. The district court thus did not abuse its discretion in finding that the effect of the challenged acquisition could be to lessen competition substantially; thus, that Plaintiffs had adequately demonstrated a likelihood of success on the merits.
C. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief
Next, a plaintiff must show that she “is likely to suffer irreparable harm in the absence of preliminary relief.” See Winter, 555 U.S. at 20, 129 S.Ct. 865. This Court has ruled that “[speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.” Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988) (citations omitted).
Plaintiffs argue that Pacific Seafood’s acquisition of Ocean Gold would create a monopsony in multiple seafood *1023 input markets on the West Coast. A mon-opsony occurs when there is “market power on the buy side of the market” and buyers consequently pay suppliers less than they would in a competitive market. Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 320-22, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007). As noted above, Plaintiffs support their argument with market concentration statistics and expert declarations. A lessening of competition constitutes an irreparable injury under our case law. See United States v. BNS Inc., 858 F.2d 456, 464-66 (9th Cir.1988) (“Koppers has demonstrated that serious questions exist regarding the possibility of irreparable harm to competition in the Irwindale aggregate market if the tender offer is consummated .... ”). Thus, the district court did not abuse its discretion in finding that Plaintiffs adequately demonstrated a threatened irreparable injury.
Defendants argue that there is no immediate danger of irreparable harm because they have terminated the proposed acquisition that led to this suit, and they have stipulated with the Oregon Attorney General that they would not enter a purchase transaction with Ocean Gold entities while the Attorney General’s investigation is pending. Defendants, however, may terminate the stipulation with 60-days’ notice to the Oregon Attorney General and the district court.
Defendants’ argument is unavailing. A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff “is likely to suffer irreparable harm before a decision on the merits can be rendered.” See Winter, 555 U.S. at 22, 129 S.Ct. 365 (quoting 11A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (2d ed.1995)). Given: (1) the limited nature of Defendants’ proposed stipulation (not to enter a “purchase transaction,” when a deal with Ocean Gold could take on many different structures); (2) the expiration of Pacific Seafood and Ocean Gold’s exclusive marketing agreement in February 2016; (3) Defendants’ history of negotiating an acquisition for many months in secret before notifying Plaintiffs; and (4) the fact that Defendants may terminate their stipulation with 60-days’ notice, Plaintiffs have established a sufficient likelihood that, in the absénce of preliminary injunctive relief, they would suffer irreparable harm before a trial on the merits could be held. Thus, the district court did not abuse its discretion in ruling that Plaintiffs sufficiently demonstrated a threat of irreparable harm.
D. The Balance of Equities Tips in Plaintiffs’ Favor
The district court likewise did not abuse its discretion in finding that the balance of equities tips in favor of Plaintiffs. Plaintiffs have demonstrated a reasonable probability that Pacific Seafood’s acquisition of Ocean Gold would substantially lessen competition in the relevant input markets on the West Coast. This decrease in competition would injure Plaintiffs, who sell fish in these markets. Defendants, on the other hand, have not established how maintaining the status quo while the district court decides the case on the merits will injure them. Accordingly, the district court’s finding as to the balance of equities in this case was not an abuse of discretion.
E. A Preliminary Injunction Is in the Public Interest
A district court should consider whether a preliminary injunction would be in the public interest if “the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences.” Stormans, Inc., 586 F.3d at *1024 1138-39. This Court has said that “the central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition ... that these statutes recognize as vital to the public interest.” Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 988 (9th Cir.2000) (emphasis added). Again, Plaintiffs have demonstrated a reasonable likelihood that Pacific Seafood’s acquisition of Ocean Gold could substantially lessen competition in relevant input markets. Thus, the district court did not abuse its discretion in finding that a preliminary injunction is in the public interest.
F. The Preliminary Injunction Is Not Overbroad
Finally, Defendants argue that the district court abused its discretion by granting an overly broad preliminary injunction. “An overbroad injunction is an abuse of discretion.” Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir.1991).
The preliminary injunction provides, as follows:
Defendants, their subsidiaries, affiliates, owners, officers, employees, and agents and all persons acting on their behalf are prohibited, through contractual or any other means, from undertaking any further act to acquire or control any interest in the stock, capital assets, real property, quota, or fishing permits of Ocean Gold Seafoods, Inc. or its affiliated companies including but not limited to Ocean Gold International, Inc.; Ocean Protein, LLC; Ocean Cold, LLC; Ocean Cold Transport, LLC, and Hoquiam Riverview Properties, LLC, or their shareholders or members until further order of this Court.
Defendants take issue with the fact that the district court prohibited them “from undertaking any further act to acquire or control any interest in” Ocean Gold. Defendants argue that the preliminary injunction is overbroad because it prohibits not only Pacific Seafood’s ultimate acquisition of Ocean Gold, but also any lawful preparatory conduct (such as negotiating an acquisition, signing a letter of intent, or entering into an agreement contingent on resolution of Plaintiffs’ antitrust- claims). According to Defendants, such preparatory conduct was specifically contemplated by the Resolution Agreement, which states that Pacific Seafood may enter new contractual arrangements with Ocean Gold.
“District courts have broad latitude in fashioning equitable relief when necessary to remedy an- established wrong.” Earth Island Inst. v. Carlton, 626 F.3d 462, 475 (9th Cir.2010) (quoting High Sierra Hikers Ass’n v. Blackwell, 390 F.3d 630, 641 (9th Cir.2004)) (internal quotation marks omitted). The “purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.” Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1023 (9th Cir.2009) (quoting L.A. Mem’l Coliseum Comm’n v. Nat’l Football League, 634 F.2d 1197, 1200 (9th Cir.1980)) (internal quotation marks omitted). “Status quo ante litem” refers to “the last uncontested status which preceded the pending controversy.” GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir.2000) (quoting Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir.1963)).
By prohibiting Pacific Seafood from undertaking any further act to acquire Ocean Gold’s stock or assets, the district court effectively preserved the parties’ last uncontested status, prior to Pacific Seafood’s attempt. to acquire Ocean Gold. Pacific Seafood and Ocean Gold could combine their operations in a number of ways to lessen competition, and the district court thus did not abuse its discretion by prohib *1025 iting Pacific Seafood from undertaking any further acts to acquire Ocean Gold’s stock or assets, as opposed to prohibiting only an actual acquisition.
Because the district court did not abuse its discretion in finding that Plaintiffs had satisfied the Winter requirements, we affirm the district court’s order granting Plaintiffs’ motion for a preliminary injunction.
y.
We hold that the district court , did not err in concluding that Plaintiffs are not required to arbitrate their claims. We further hold that the district court did not abuse its discretion in granting Pláintiffs’ motion for a preliminary injunction. Accordingly, both orders of the district court are
AFFIRMED.

. Plaintiffs here are the second group, if the group of fishermen who filed the 2010 action is considered the first group.

. Several — although not all — of the plaintiffs in the instant action also were plaintiffs in the Whaley litigation.

. Plaintiffs dropped this last claim for a declaratory judgment on January 23, and added a claim of unlawful merger under § 7 of the Clayton Act on February 26.

. Because nearly all of the plaintiffs in the instant suit were also plaintiffs in the Whaley litigation, we analyze the relevant issues assuming, but not deciding, that all of the current plaintiffs are bound by the Resolution Agreement. Were we to conclude, as does the concurring/dissenting opinion, that Plaintiffs’ claims are within the scope of Paragraph 3(a), see Concur. & Dissent. Op. at 1028-30, presumably, we would have to decide whether Plaintiffs here, who were not plaintiffs in the Whaley litigation, are bound by the Resolution Agreement, including Paragraph 3(a).

. The Resolution Agreement defines "West Coast” as encompassing the west coast of the continental United States from northern California to the Canadian border.

. The concurring/dissenting opinion argues that the purchase agreements "authorize” and "permit” Pacific Seafood to act as Ocean Gold's exclusive marketer. Concur. & Dissent. Op. at 1029. But this argument elides the clear and unambiguous language of the Resolution Agreement, that Paragraph 3(a) applies only to agreements that require Pacific Seafood to act as Ocean Gold’s exclusive marketer.

. Because we conclude that paragraph 3(a) of the Resolution Agreement does not encompass the acquisition by Pacific Seafood of Ocean Gold’s stock, we need not decide the other issues tendered by the parties, including whether Paragraph 3(a) is an agreement *1020 to arbitrate or whether Judge Hogan or Magistrate Judge Jelderks, consistent with the legal and ethical obligations that bind federal judges, could serve as a privately-appointed arbitrator. The concurring/dissenting opinion concludes that "Plaintiffs’ argument that magistrate judges may not serve as arbitrators is therefore without merit in light of Congress’s specific language to the contrary.” Concur. & Dissent. Op. at 1027. The authorities relied on, however, in support of the argument that there is no impediment to Magistrate Judge Jelderks, Judge Hogan’s designated replacement, acting as an arbitrator are inapposite. Even assuming that the Federal Magistrates Act and the Alternative Dispute Resolution Act of 1998, on which the concurrence/dissent relies, see id. at 1026-28, grant to district courts the authority to designate magistrate judges to serve as arbitrators as part of a court's alternative dispute resolution program, nothing in the record demonstrates that magistrate judges were so authorized by the District of Oregon. The Alternative Dispute Resolution Act plainly requires the authorization to come from the "United States district court ... by local rule,” not from a single judge of that coqrt. 28 U.S.C. § 651(b) ("Each United States district court shall authorize, by local rule adopted under section 2071(a), the use of alternative dispute resolution processes in all civil actions....”). The concurring/dissenting opinion insists "that the authorization here is based on the District of Oregon's local rules. The local rule in question specifically permits an individual judge — 'on his/her own motion or at the request of a party’ — to assign the case to arbitration.” Concur. & Dissent. Op. at 1027 (quoting D. Or. Civil Local Rule 16-4(e)(4)(A)). But nothing in Local Rule 16-4(e) speaks to who may be appointed as an arbitrator and certainly does not authorize *1021 that judge to appoint an active magistrate judge to act as an arbitrator in such a case.

. “Input market” signifies seafood processors' purchase of fish from fishermen, such as Plaintiffs.

. "Ex vessel prices” are those prices paid to fishermen for their catches at the point of delivery.